The **DOLMATCH GROUP, LTD.,** Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 96–363C.

United States Court of Federal Claims.

Jan. 16, 1998.

Reissued March 2, 1998.\*

---

\* This opinion is being reissued for publication on defendant's unopposed motion.

Harold I. Rosen, Washington, DC, for plaintiff.

Armando O. Bonilla, U.S. Department of Justice, with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Commercial Litigation Branch, and James I. Wilson, Assistant General Counsel, Smithsonian Institution, all of Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This case involves a dispute arising from an alleged contract between plaintiff and the Smithsonian Institution to distribute videotaped Smithsonian programs. It is before the court on defendant's motion to dismiss and for summary judgment and on plaintiff's cross-motion for summary judgment. Oral argument was held on October 2, 1997. The court took additional evidence in a hearing held on November 13, 1997.[1] For the following reasons, the motion to dismiss is granted, but the parties' motions for summary judgment are denied.

## BACKGROUND

The Dolmatch Group (the Group) is a marketing and communications organization with primary interest in developing new market opportunities in broadcasting and publishing. Murray Dolmatch is the founder and president of the Group. Defendant acted through the Smithsonian Institution Press (SIP), Video Division, which is a revenue-producing office within the Smithsonian Institution.[2] At all times relevant to this case, Andrew Ferguson was the director of the Video Division. Felix Lowe, the director of the SIP, was Ferguson's supervisor.

In the early 1990s the Video Division desired to assemble a comprehensive collection of foreign programs on videotape relating to various museums worldwide and to market them to the public through direct-mail service, museum gift shops, and certain retailers. On November 12, 1992, after several discussions with Mr. Ferguson, Mr. Dolmatch proposed an agreement authorizing the Group to serve as the Smithsonian Institution's exclusive representative in contacting foreign museums and libraries for purchase of their videotaped programs. On January 12, 1993, Mr. Ferguson expressed his assent to the proposed agreement in a letter he sent to Mr. Dolmatch. According to Mr. Ferguson's testimony, this letter was tantamount to a "hunting license," allowing the Group easier access to museums and libraries under the Smithsonian name. This license, he explained, was not intended to create an exclusive agency or to obligate the Smithsonian in

---

1. During this proceeding, the testimony of John Cobert, the current director of the Smithsonian Institution's Office of Contracting, Robert Perkins, Mr. Cobert's predecessor, and Andrew Ferguson was heard. *See* RCFC 43(c).

2. The Smithsonian Institution is a trust instrumentality of the United States.

any way.

After receiving the letter, Mr. Dolmatch began gathering videotaped programs and forwarding them to Mr. Ferguson for review and consideration. On July 20, 1993, Mr. Dolmatch formally proposed a financial arrangement in exchange for the Group's services: advance payment of $3000 and subsequent royalty payments to the Group equal to fifteen percent of sales. The record does not reflect any Smithsonian response to Mr. Dolmatch's financial proposal. No Smithsonian Institution representative ever instructed the Group to purchase any videotaped programs on behalf of the Smithsonian.

The Group shifted gears at some point toward the end of 1993. It apparently proposed *selling* Smithsonian video-programs rather than *buying* video-programs for the institution. The record contains a letter from the Group dated September 29, 1993, addressed to Mr. Ferguson stating: "Thank you for your confidence in us, and for your authorization that we may exclusively represent the Smithsonian Video Collection for international television and home video license." (Def.'s App. of 5/1/97, at 22.) At no point in his affidavit does Mr. Dolmatch aver that this letter was the result of an oral agreement.

In a November 3, 1993, letter Mr. Dolmatch recommended canceling the prior arrangement for the purchase of videos for Smithsonian, claiming that it was not in the best interest of the institution. The Group did not request any payment for the services it had already performed, allegedly at Smithsonian's request. In the same letter, however, the Group stated: "We respectfully request your authorization to represent the entire Smithsonian Video catalog worldwide, exclusive of the U.S., unless you specifically request us to market certain programs domestically." (Def.'s App. of 5/1/97, at 20.) Under this proposed arrangement, the Group would receive a thirty-five-percent commission on the sale of videotapes and pay all of its own expenses for travel, promotion, exhibits, and advertising.

Although there is no indication that Mr. Ferguson or anyone at the Smithsonian replied, the Group proceeded to market the Smithsonian Institution's videotapes worldwide. According to Mr. Ferguson, this arrangement was the same as the "hunting license" used in the previous arrangement with the Group.[3] Terrance Afer–Anderson, marketing manager for the SIP, provided promotional copies of video-programs, brochures, and literature to plaintiff.[4] (*See* Pl.'s App. of 7/2/97, at 4, 9.) As part of its marketing efforts, the Group used marketing space in overseas trade shows to promote the Smithsonian videotapes.

On December 9, 1993, Mr. Dolmatch requested authorization to market the Smithsonian videotapes domestically. The record does not disclose whether Mr. Ferguson, or anyone else from the Smithsonian Institution, ever responded directly to that request or authorized the Group to market the videos in the United States.

By letter dated February 8, 1994, Mr. Dolmatch notified Mr. Ferguson that a long-term client of his was interested in purchasing a license for a series of videos identified as *The Best of Smithsonian World.* On March 1, 1994, Mr. Dolmatch forwarded to Mr. Ferguson an unsigned document entitled "Agreement to Represent Program Producer," which was characterized by Mr. Dolmatch as a "standard distribution agreement." Upon receipt of the Group's proposed distribution agreement, Mr. Ferguson forwarded the document to the Smithsonian Institution's Office of Contracting and Property Management (OCPM) for review by a contracts specialist. The proposed distribution agreement was also reviewed by the Smithsonian's Office of General Counsel. On April 13, 1994, the OCPM's contract specialist forwarded the draft agreement to Mr. Ferguson with handwritten notations and some proposed changes.[5] The contract spe-

---

**3.** Mr. Ferguson repeatedly referred to the arrangement between the Smithsonian and the Group as one of a "hunting license" and not a formal contract. He testified during the hearing that such a "hunting license" would not preclude others from marketing the same materials for the Smithsonian.

**4.** Mr. Ferguson, who was aware of the requests for promotional copies, testified that it was routine for the SIP Video Division to furnish promotional videotapes to potential distributors.

**5.** Changes proposed by a contract specialist included the clarification that the Group would pay for all travel, exhibitions, promotions, and advertising expenses incurred in marketing and distribution of the videos.

cialist also noted on the facsimile transmittal cover sheet that she was awaiting "Jim Wilson's response." [6]

On April 27, 1994, while the Group's proposed distribution agreement was under consideration, the Group received a letter from Discovery Communications (Discovery) [7] confirming its interest in a number of titles from *The Best of Smithsonian World* series. Discovery was anxious to finalize a deal because it wanted to include the Smithsonian videotaped programs in its summer schedule. On May 2, 1994, the Group informed Mr. Ferguson of Discovery's interest and the potential for an agreement; this letter was copied to Mr. Lowe.[8] On June 16, 1994, Mr. Dolmatch notified Mr. Ferguson that the Group had reached an agreement with Discovery for the licensing of Smithsonian videos. Mr. Dolmatch urged a prompt response because of Discovery's programming deadlines.

In late June 1994 Discovery published its programming guide, listing approximately ten episodes of *The Best of Smithsonian World*. WETA–TV,[9] the co-producer and co-owner of the subject programs, learned about the purported sale of programs from Discovery's announced summer programming guide. WETA–TV contacted the Smithsonian, alleging that the Smithsonian failed to secure the necessary cable and home-video rights prior to any sale to Discovery. While pursuing the required licenses, the Smithsonian reexamined its dealings with the Group.

On June 20, 1994, Mr. Ferguson forwarded the draft agreement with the handwritten notations to Mr. Dolmatch via facsimile. Mr. Dolmatch, in his sworn declaration dated November 18, 1997, stated that the June 20, 1994, facsimile transmission contained only a

proposed agreement with handwritten comments, while he received a retyped version incorporating the handwritten changes a week later by regular mail. Neither copy was signed by a government representative. It is unclear who retyped the agreement to incorporate OCPM's comments and who sent it to the Group; Mr. Ferguson testified that he did not. On June 27, 1994, Mr. Dolmatch executed the retyped contract on behalf of the Group, with changes incorporated, and returned it to Mr. Ferguson. In returning the final document, Mr. Dolmatch attached a list of videotape titles, including *The Best of Smithsonian World* series, that the Group proposed to market. Despite the fact that the agreement was never signed on behalf of the government, Mr. Ferguson continued to assist the Group with its efforts to market the Smithsonian videos.

On August 1, 1994, Mr. Ferguson wrote the Group, instructing it to cease all activities regarding the distribution of selected Smithsonian videotapes. Mr. Ferguson also stated: "The distribution contract between Smithsonian VIDEO and The Dolmatch Group, Ltd. is currently being reviewed by our contracts office and all distribution operations are to be suspended pending the approval and signature of said contract." [10] (Def.'s App. of 5/1/97, at 48.) Direct discussions were held between the Smithsonian, Discovery, and WETA–TV once the issue of rights was raised. An agreement was reached regarding the Discovery sale sometime between July and November 1994.

On November 1, 1994, the Group submitted to the Smithsonian an invoice in the amount of $31,500 for the commission earned on the sale to Discovery. The commission was thirty percent—the rate stated in the

---

6. James Wilson served as the assistant general counsel for the Smithsonian Institution's Office of General Counsel at the time.

7. Discovery Communications operates *The Discovery Channel* and *The Learning Channel,* two national cable-television stations, and is based in Bethesda, Maryland.

8. Mr. Dolmatch closed the letter with the following paragraph: "I believe that we should see substantial revenues from our initial presentation, and trust that you are as pleased as we are." (Def.'s App. of 5/1/97, at 36.) Mr. Fergu-

son testified that he forwarded the letter to Mr. Lowe on May 8, 1994, to solicit his comments.

9. WETA–TV is a public-broadcasting television station based in the Washington, D.C., area.

10. The Smithsonian never informed the Group of the results of the review of the distribution contract indicated in the August 1 letter. Instead, Mr. Ferguson, on October 6, 1994, notified Mr. Dolmatch that the Video Division was seeking a distributor for all of its properties and invited the Group to submit a proposal.

revised draft agreement—of the reported contract price of $105,000. On January 9, 1995, after discussions with Mr. Wilson, Mr. Dolmatch agreed that the Discovery contract price was $98,000, instead of $105,000, and reduced the invoice to $29,400. On February 2, 1995, the Smithsonian paid $29,400 to the Group. This payment was authorized by Mr. Wilson. The Group did not complete any other sale of the Smithsonian's programs, although other entities expressed interest in various titles. The Smithsonian made no further payments to the Group.

On June 24, 1996, the Group filed its complaint in this action, alleging breach of contract, breach of implied-in-fact contract, unjust enrichment, and *quantum meruit* and seeking $142,983 in compensation for services performed.[11] One of the court's difficulties in evaluating this claim is that the plaintiff has been imprecise in identifying the actions or words that constitute the alleged contract. The Dolmatch affidavit is also ambiguous in this respect. The most the court can glean is that plaintiff makes alternate, not entirely consistent arguments. One appears to be that the September 29, 1993, letter evidences a prior, express oral agreement for the Group to market Smithsonian videos. Another possibility is that the Smithsonian's reaction to the November 3, 1993, proposal created a contract implied in fact. A final argument appears to be that the unsigned agreement evidences an express offer by the Smithsonian, which was accepted by the Group. As a fallback position, the Group contends that it is entitled to payment on equitable grounds.

Defendant responds that the court lacks jurisdiction to address the unjust-enrichment and *quantum meruit* counts and that these counts should be dismissed. Furthermore, defendant argues that no valid contract, either express or implied-in-fact, arose be-

tween the Group and the Smithsonian Institution. Defendant also contends that the purported written contract was not signed by any Smithsonian representative and that the purported oral agreement was not made by an authorized Smithsonian representative.[12]

## DISCUSSION

### A. *Defendant's Motion to Dismiss*

■■■■ As a preliminary matter, the court addresses the defendant's motion to dismiss plaintiff's unjust-enrichment and *quantum meruit* claims. It is settled that the Court of Federal Claims does not possess the power to hear claims based on contracts implied in law. *See Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). A claim based strictly on unjust enrichment is one based on a contract implied in law, not fact, and is thus outside the jurisdiction of this court. *See Aetna Cas. & Sur. Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059–60 (1981). Similarly, a claim based on *quantum meruit* is also founded on a contract implied in law and is thus outside the jurisdiction of this court. *See Fincke v. United States,* 230 Ct.Cl. 233, 246, 675 F.2d 289, 296–97 (1982). Plaintiff argues, however, that the Federal Circuit has recognized the doctrine of equitable estoppel as within the court's jurisdiction in the context of implied-in-fact contracts. *See Burnside–Ott Aviation Training Ctr., Inc. v. United States,* 985 F.2d 1574, 1581 (Fed.Cir. 1993). While plaintiff is correct, this does not save its unjust-enrichment or *quantum meruit* counts from dismissal. To the extent it is alleged that a contract implied in fact arose through application of principles of equitable estoppel, the court would have jurisdiction. To the extent that plaintiff makes purely equitable claims to relief, such as unjust-enrichment and *quantum meruit,*

---

11. Of the damages sought in the complaint, approximately $90,000 is claimed as lost commissions based on a projected $300,000 in sales from a minimum of five potential customers. The remainder of damages sought relate to expenditures totaling $52,983, broken down as follows: $19,980 for expenses related to European television trade shows in 1993 and 1994; $3103 related to meetings with the Video Division; $18,000 for administrative expenses, including

Mr. Dolmatch's salary; $8400 for promotional literature used in marketing of the Smithsonian videos; and $3500 for legal costs.

12. Defendant further contends that the $29,400 payment satisfies any debt that the Smithsonian may have had under contract or equity and that recovery for lost commissions is precluded as a matter of law.

those counts must be dismissed for lack of jurisdiction. *See* 28 U.S.C. § 1491(a) (1994).

### B. *Summary Judgment on Counts I & II*

#### 1. *Basic Contract*

 The primary question is whether a contract, either express or implied-in-fact, came into existence between the Group and the Smithsonian. A party alleging a contract with the United States must prove: mutuality of intent, unambiguous offer and acceptance, consideration, and the authority to contract of the government official who entered or ratified the alleged agreement. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990). The requirements for an implied-in-fact contract are the same as those for an express contract. *See Trauma Serv.*, 104 F.3d at 1325; *Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976). The party alleging a contract with the United States also bears the risk of accurately ascertaining the authority of a government official who purports to act on behalf of the government; apparent authority will not suffice. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

Applying these principles here shows that plaintiff faces a number of obstacles in establishing a contract. There is nothing in the Dolmatch affidavit averring any particular promises that led to the September 29 letter. Moreover, if the September letter evidences an agreement establishing an agency relationship, it is confusing why the November 3 letter should seek permission for the same arrangement. Mr. Ferguson denies having made any outright promises. The evidence thus far is only that he expressed hopes that a contract could be pursued in the future. As far as he was concerned, the Group had

no more than a "hunting license," which did not obligate either party to perform. There is simply insufficient evidence to keep this aspect of the claim alive.

As to the November letter and the Smithsonian's conduct subsequent to it, the evidence that anyone, not to mention anyone with authority, agreed to the Group's proposal, is *de minimis* at best. Mr. Afer–Anderson provided marketing materials for various video-programs. Mr. Ferguson testified, however, that it was common for these materials to be distributed to those interested in specific video-programs. This fact thus means nothing, by itself. It is troubling, however, that in February 1995 the Smithsonian paid $29,400 as a commission for the Discovery transaction.[13] The payment does not appear to have been designated as a settlement of a disputed claim. The fact of the payment, therefore, along with the cooperation, are some circumstantial evidence of an agreement between Mr. Dolmatch and Mr. Ferguson.

The final assertion is that the unsigned contract does in fact evidence an agreement struck when the Smithsonian marked up and forwarded back to the Group its prior proposal. It allegedly constituted an offer by the Smithsonian that was accepted by the Group on June 27. There is a question, however, as to which party actually incorporated the comments of the contracting office into the revised agreement.[14] The Government, moreover, points out that Mr. Ferguson's cease-and-desist letter of August 1, 1994, makes it clear that the offer had yet to be accepted. The Group was to suspend its operations "pending the approval and signature of [the] contract." *See, e.g., Restatement (Second) of Contracts* § 26 & cmt. a (1979) (distinguishing preliminary negotiations from offers). The government also did not accept the written offer by any conduct or inaction during the short time between the

---

**13.** This payment was authorized by the assistant general counsel for the Smithsonian, who does not possess contracting authority.

**14.** According to the testimony of Mr. Ferguson, the marked-up copy of the draft agreement that he had forwarded earlier to Mr. Dolmatch on June 20, 1994, was an internal document that was not meant for dissemination. He testified

that he forwarded this document only to inform Mr. Dolmatch of the comments of the Smithsonian attorneys regarding the draft. It is clear that, aside from not being an offer, there was no intent, on the part of Mr. Ferguson or any other government representative, to bind the government through that document.

execution of the offer by the Group on June 27 and the cease-and-desist letter on August 1.

An express contract, therefore, would appear not to exist. Conduct, however, when viewed in light of the surrounding circumstances, can give rise to a tacit meeting of the minds. *See Hercules, Inc. v. United States*, 516 U.S. 417, 423–25, 116 S.Ct. 981, 986, 134 L.Ed.2d 47 (1996); *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426–27, 67 L.Ed. 816 (1923). Although the evidence is, at best, scanty, plaintiff has raised a question of fact as to whether the retyped contract constituted a counteroffer by the Smithsonian. The relevant questions are: who prepared the retyped version; and was it done with the intent of conveying an acceptable counteroffer? Questions of fact therefore exist as to whether an implied-in-fact contract arose after the November 1993 letter and as to whether the retyped contract constituted a counteroffer by the Smithsonian, which was then accepted by plaintiff.

Even assuming there is some marginal evidence that an agreement coalesced, a question remains as to whether anyone with contracting authority concurred on behalf of the Smithsonian. Absent agreement or ratification by someone with contracting authority, an agreement between others would be unenforceable.

### 2. *Actual authority*

The Group negotiated the alleged distribution agreement exclusively with Mr. Ferguson, who was the director of the Video Division. There is no question that Mr. Ferguson had no express actual authority to bind the Smithsonian into a distribution contract. In a letter dated December 1, 1990, the Secretary of the Board of Regents of the Smithsonian Institution delegated contracting authority to Mr. Perkins, director of OCPM.[15] (*See* Def.'s App. of 5/1/97, at 116.) This authority was broad and encompassed the entirety of the Smithsonian's procurement activity, with the exception of incoming contracts and grants. Under that delegation, the director could subsequently delegate the contracting authority under two conditions: that delegation had to be in writing; and, once delegated by the director, the contracting authority could not be delegated further. In addition, the delegation letter referred to the *Smithsonian Staff Handbook* for further details on "the duties, delegations of authority, responsibilities and limitations of the procurement." Mr. Perkins, the director of OCPM, made several limited delegations of contracting authority to Mr. Lowe, the director of SIP, with the restriction that Mr. Lowe could not further delegate the contracting authority.[16] (*See id.* at 117.) Mr. Lowe's authority, according to the delegation letter, was limited to contracting with authors, making co-publishing arrangements, and contracting for procurement of printing and related materials and services. Mr. Perkins testified that he did not delegate to either Mr. Lowe or Mr. Ferguson the authority to enter into a distribution contract of a nature the Group alleges. Furthermore, Mr. Lowe, in his declaration, stated that he never delegated any contracting authority to Mr. Ferguson. Thus Mr. Ferguson never had express actual contracting authority.

Plaintiff argues, however, that Mr. Ferguson possessed implied actual authority to enter into a distribution contract on behalf of the government, by virtue of his position and

---

15. The secretary of the Board of Regents of the Smithsonian Institution possesses authority granted by statute. *See* 20 U.S.C. § 46 (1994).

16. The record contains letters dated February 22, 1985, and April 15, 1985, showing that Mr. Perkins, director of OCPM, made limited delegations of contracting authority to Mr. Lowe, director of SIP. The apparent discrepancy in the record between the date when Mr. Perkins delegated authority to Mr. Lowe and the date when the Secretary himself delegated authority to Mr. Perkins is resolved by the Smithsonian officials' testimony. The practice in the Smithsonian was that each time a new Secretary is appointed, he or she issues a new delegation letter to the subordinates, usually iterating the previously existing scope of delegated authority. The record does not contain a delegation letter from the Secretary to Mr. Perkins dated on or before 1985, the year when Mr. Perkins delegated limited authority to Mr. Lowe. The record does, however, contain delegation letters from 1990 and 1995, confirming the Smithsonian's practice that each new Secretary appointed reissues a delegation letter.

438

title as director of the Video Division.[17] Plaintiff notes that, as the director of the Video Division, Mr. Ferguson was responsible for the "performance and success of the video department," including "[m]arketing of videos of the Smithsonian." (Pl.'s Cross–Mot. for Summ. J. at 34.)

A government official who has implied actual authority can bind the government. *See H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). The Federal Circuit in *Landau* held that the actual authority of a government official is implied when such authority is " 'considered to be an integral part of the duties assigned' " to that official. *Id.* (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 43 (1982)). In determining whether a contracting authority is an integral part of Mr. Ferguson's assigned duties, the court looks at Mr. Ferguson's job description, which in pertinent part provides that Mr. Ferguson's duties include: "[n]egotiat[ing] with prospective clients regarding terms of SI/SIP contractual agreements;" and "[i]nitiat[ing] proposals for the acquisition of video projects for the Director's review, counsel, and approval to acquire." [18] (Def.'s App. of 5/1/97, at 121–22.) Because it would have been possible for Mr. Ferguson to perform his duties of negotiating contracts and initiating proposals without going further to bind the government in contract, it was not essential to his function that he have contracting authority. It follows he had no authority to enter into binding arrangements with the Group.

### 3. *Ratification*

When an unauthorized government representative enters into an agreement, the agreement may still be valid if ratified by a person with express or implied actual authority to bind the government. *See Williams v. United States,* 130 Ct.Cl. 435, 446–47, 127 F.Supp. 617, 623 (1955); *Dan Rice Constr. Co. v. United States,* 36 Fed.Cl. 1, 3–4 (1996). "Ratification occurs when a ratifying official has actual or constructive knowledge of an unauthorized agreement, and expressly or impliedly adopts the agreement." *Aero–Abre, Inc. v. United States,* 39 Fed.Cl. 654, 657 (1997) (citing *Williams* ). Thus ratification can only occur where the person ratifying the agreement has knowledge of the material facts pertaining to the agreement. *See United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 375–76, 45 L.Ed. 563 (1901); *cf. Restatement (Second) of Agency* § 91 (1957). The Federal Circuit, moreover, has recently revitalized the concept of institutional ratification. *See Janowsky v. United States,* 133 F.3d 888, 891–92 (Fed.Cir.1998).

Mr. Dolmatch avers in his affidavit that he was told by Mr. Ferguson that he kept Mr. Lowe abreast of the discussions between Mr. Ferguson and Mr. Dolmatch. Plaintiff describes Mr. Lowe as being "involved with the marketing arrangement" and "familiar with the marketing agreement." Mr. Lowe, in his signed declaration filed with the court, states that he was only "generally aware" of the discussions relating to the Group's representation of the Smithsonian and that he was not privy to the details of such an arrangement and had not authorized

---

17. Plaintiff also points to language in the *Smithsonian Staff Handbook:* "Directors of auxiliary activities are authorized to direct or conduct sales of goods or services needed to operate their programs within the policies and limitations of this handbook." Office of the Secretary, Smithsonian Institution, *Smithsonian Staff Handbook: Financial Management—Auxiliary Activities,* ch. 3, ¶ 2 (Dec. 16, 1980) [hereinafter *Handbook* ]. Mr. Perkins testified, however, that the Video Division was not considered an auxiliary activity, but rather only a part of an auxiliary activity, namely the Smithsonian Institution Press.

18. The record contains the position-description cover sheet and the description of job duties.

The position-description cover sheet lists two job titles: video projects and acquisitions director (recommended); and audio-visual production officer (official). The position-description sheet itself lists "special assistant for video acquisitions" as the title for which the job duties are provided. Mr. Ferguson's title, however, is director of Video Division. The court noted its concern as to the discrepancy between Mr. Ferguson's title and the titles used on the position-description sheet the government submitted to demonstrate Mr. Ferguson's job duties. Plaintiff's attorney did not object to the use of the aforesaid position-description sheet for determining Mr. Ferguson's duties.

such an arrangement. Of the documents presented to the court, only one is known to have been forwarded or sent to Mr. Lowe. That document, written by the Group, indicates the Group's expectation of compensation. There is some evidence, therefore, that Mr. Lowe was aware of the Group's activities and expectations.

Defendant contends, however, that Mr. Lowe was not authorized to enter this type of contract; his delegated authority was limited to entering co-publishing arrangements and contracting with authors. There seems to be a conflict, however, between Mr. Perkins's interpretation of the delegation of contracting authority and the delegations set out in the *Smithsonian Staff Handbook*. According to Mr. Perkins, directors of auxiliary activities were limited to the specific delegation letters originating from the OCPM. The handbook indicates a much broader authorization and does not refer to other procedures for delegation of authority. Specifically, the handbook allows directors of auxiliary activities (such as Mr. Lowe) to direct or conduct sales and to contract and purchase for goods and services "needed to operate their programs...." *See Handbook* ¶¶ 3–2, 5–2. Given this uncertainty as to the exact nature of Mr. Lowe's authority and of his involvement in the negotiations with the Group, the court finds a genuine issue exists precluding summary judgment.

Plaintiff also alleges, moreover, that the review of the draft agreement by a contract specialist in OCPM and the forwarding of a revised agreement to the Group by the Smithsonian indicate that a counteroffer was prepared by OCPM, which is conferred contracting authority. The record is unclear as to the nature of the review of the contract and the extent of the involvement of authorized personnel. Mr. Perkins, the director at the time, testified that no such contract was authorized to the best of his knowledge. Because the court would have to weigh conflicting evidence on this issue, summary judgment is inappropriate.

4. *Damages*

Even if plaintiff can establish an agreement between authorized individuals, there are serious shortcomings in its asserted damages. It seeks to recover $142,983 in expenses and lost commissions. Defendant argues that, assuming plaintiff prevails on liability, plaintiff is not entitled to recover anything because (1) the payment of $29,400 represents all that would be owed to plaintiff under the contract; (2) recovery for expenses is precluded under the alleged contract as signed by Mr. Dolmatch on June 27; and (3) recovery for lost commissions is precluded because they are too speculative.

The written draft contract, which plaintiff contends expresses the parties' agreement, clearly places the burden of expenses on the plaintiff; the Group was to be compensated by its commissions. Normally, breach damages are measured by plaintiff's expectation under the contract. *See Wells Fargo Bank v. United States*, 88 F.3d 1012, 1021 (Fed.Cir.1996). Defendant is also correct that the Federal Circuit's decision in *Wells Fargo Bank* affirms the general principle that damages that are speculative or too remote and uncertain are unrecoverable. *See id.* at 1022–24. The Group has been compensated for the only sale that was actually consummated. It would appear that any further commissions would involve speculation.

However, it is also the case that, where expectation damages are uncertain, a plaintiff can recover reliance damages as an alternative; this includes expenditures in preparation and part performance. *See Restatement (Second) of Contracts* § 349 (1979); John D. Calamari & Joseph M. Perillo, *Contracts* § 4–9, at 603–04 (3d ed.1987). In its complaint, plaintiff seeks to recover expenses incurred while operating under the alleged agreement.[19] The court notes that plaintiff's expenses are not identified to particular sales. It is not clear whether they relate to work done to earn the commission it

19. The court cannot ascertain upon which sales or potential sales plaintiff bases its calculation of lost commissions. The record contains selected letters from potential customers expressing interest in purchasing specific video-programs. Without making a formal finding, the court notes that plaintiff will need to prove with certainty that it was entitled to further commissions.

**440**

has already received. Plaintiff cannot recover both expectancy and reliance damages on the same transaction. *See Restatement (Second) of Contracts* § 349 cmt. a (1979) (noting that party makes a choice between profit and reliance expenditures).

Moreover, some of the expenses related to participation in trade shows and meetings at the Smithsonian predate the November 3, 1993, offer to enter into an arrangement with the Smithsonian. It would appear that these expenses are also unrecoverable, having occurred prior to the date when the Group sought to act as Smithsonian's distributor.

## CONCLUSION

Although the evidence is slim, the court finds that genuine issues of material fact exist with respect to whether an agreement arose between the parties and whether that alleged agreement was consummated for the agency by authorized individuals. The parties' cross motions for summary judgment are therefore denied. Plaintiff's claims in counts III and IV based on unjust enrichment and *quantum meruit* are dismissed. The court will arrange a status conference to consider further proceedings.