USA, ex rel., Gary R. EITEL,
et al., Plaintiffs,

v.

Roy D. REAGAN, et al., Defendants.

Civ. No. 94–425–JO.

United States District Court,
D. Oregon.

Aug. 16, 1995.

mel, Michael W. Carmel, Ltd., Phoenix, AZ, R. Alan Wight, Miller Nash Wiener Hager & Carlsen, Portland, OR, Michael R. Sullivan, Douglas G. Carroll, Sullivan Walsh & Wood, Los Angeles, CA, Stanley E. Clark, Redmond, OR, Ronald H. Hoevet, Hoevet & Snyder, P.C., Portland, OR, Joseph P. Russoniello, Michael Traynor, Vernon M. Winters, Cooley Godward Castro Huddleson & Tatum, San Francisco, CA, Maynard C. Craig, Craig & Shepherd, Chico, CA, David T. Stitt, Michael Robinson, Venable Baetjer & Howard, McLean, VA, for Defendants.

**ROBERT E. JONES, District Judge:**

Plaintiff Gary Eitel brings this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* Plaintiff alleges that the defendants, five aviation contractors to the United States Forest Service ("USFS") and certain individuals [1], knowingly presented false or fraudulent claims for payment or approval to the United States and conspired to present such claims, in violation of 31 U.S.C. §§ 3729(a)(1), (2), and (3). Plaintiff additionally alleges that the defendants knowingly misrepresented the value of certain aircraft exchanged with the USFS, and knowingly made illegal purchases of government property, in violation of 31 U.S.C. §§ 3729(a)(4) and (6).

The case is before me on all defendants' motions to dismiss the complaint for lack of subject matter jurisdiction. After considering the arguments of the parties and the evidence submitted, the defendants' motions are GRANTED.

### BACKGROUND [2]

This action arises out of the USFS's Historic Aircraft Exchange Program, under which, as pertinent to this action, various USFS air tanker contractors were given the opportunity to exchange historic aircraft for retired military aircraft to be used in fire fighting efforts. The five defendant aviation contractors, T & G Aviation, Inc. ("T & G"), Hawkins & Powers Aviation, Inc. ("Hawkins"), Hemet Valley Flying Service ("Hem-

Kristine Olson, United States Attorney, District of Oregon, Neil Evans, Assistant United States Attorney, United States Attorney's Office, Portland, OR, Justine Fischer, Portland, OR, Michael F. Hertz, U.S. Department of Justice, Civil Division, Washington, DC, Steve W. Berman, Jeffrey T. Sprung, Hagens & Berman, Seattle, WA, for Plaintiffs.

David B. Howorth, Foster Pepper & Shefelman, Portland, OR, Levi J. Smith, Portland, OR, John P. Frank, Gerald K. Smith, Lewis & Roca, Phoenix, AZ, Michael W. Car-

---

1. With the exception of defendant Roy Reagan, the individual defendants all are alleged to be officers of the defendant aviation contractors.

2. The background summary is fashioned from the allegations of the complaint for purposes of this opinion only. The court acknowledges that the defendants contest many of the allegations.

et"), T.B.M, Inc. ("TBM"), and Aero Union Corporation ("Aero"), obtained aircraft in 1988 and 1989 through the exchange program.

The USFS uses air tankers for fire fighting purposes throughout the National Forest system. The USFS secures air tanker services by contracting with private aviation contractors, who use modified aircraft to disperse fire retardant materials. (Complaint, ¶ 23.)

In 1987, the Interagency Airtanker Board suspended the use of C–119 air tankers because of several fatal accidents involving the aircraft. Plaintiff alleges that Hawkins and Hemet primarily used C–119s and were affected significantly by the suspension. Plaintiff further alleges that defendant Reagan approached Hawkins and Hemet with a "scheme" to obtain retired Defense Department C–130A aircraft through the Historic Aircraft Exchange Program for use as replacement air tankers. (Complaint, ¶¶ 26–28.) According to plaintiff, after the Defense Department rejected Reagan's "scheme," Reagan contacted the USFS, which accepted the proposal and initiated discussions with the Air Force to obtain retired C–130A and P–3A aircraft. (Complaint, ¶ 30–31.)

Plaintiff alleges that Reagan assisted Hemet, TBM, Hawkins, and Aero in obtaining aircraft through the exchange program, and that T & G purchased two additional airplanes from Reagan, airplanes allegedly obtained by Reagan as commissions for his efforts. All told, plaintiff alleges that the defendants obtained 34 military aircraft worth a total of $80 million through the exchange program. (Complaint, ¶¶ 1, 33.)

Each defendant contractor signed an exchange agreement with the USFS. The exchange agreements restrict the use of the aircraft to use as fire fighting air tankers and provide that the aircraft "may only be flown in support of forest, brush, or rangeland protection * * *." Plaintiff alleges that the defendants have used the aircraft in "blatant violation" of that restriction (Complaint, ¶ 3),

and accuses the defendants of using the aircraft for purposes unrelated to the USFS' fire fighting mission, of selling or trading the aircraft, and of "cannibalizing" the aircraft for parts. In addition, plaintiff alleges that the defendants transferred virtually worthless aircraft to the USFS instead of aircraft of historic value. (*E.g.,* Complaint, ¶¶ 76–81.) The merits of those contentions are not at issue in the present motions.

In August 1991, plaintiff, self-described as an "aviation consultant and former military combat pilot," read a magazine article describing the exchange program. Plaintiff contacted USFS representatives to see if his clients could participate in the program. In October 1991, plaintiff requested information from the USFS about the program, and was told that the exchange program was "on hold."

According to plaintiff's affidavit, for the next two months he contacted the USFS repeatedly to gain information about the program, but was "stonewalled." Fourth Affidavit of Gary R. Eitel ("Eitel Aff."), ¶ 10. During the same period of time, plaintiff learned from a friend, Jack Chisum, that "he was having difficulties because he and others were operating C–130 aircraft in Kuwait and other surrounding countries." Eitel Aff., ¶ 8. Plaintiff states that in November 1991, Chisum "admitted" that the problems in Kuwait were related to the exchange program. Eitel Aff., ¶ 13. Plaintiff also states that Chisum told him that other participants in the exchange program "were doing illegal things," and that the program participants "knew in advance that they would use the planes for profit on non-firefighting uses." Eitel Aff., ¶ 14. Plaintiff claims that Chisum disclosed that the "scheme * * * was organized out of Aero Union's offices" and that defendant Reagan "was located at Aero Union's offices." *Id.*[3]

Plaintiff states that in late 1991, he placed a call to the U.S. Department of Agriculture Office of Inspector General ("OIG") via an agency "hotline," and reported his knowledge

---

**3.** This statement is contradicted by plaintiff's deposition, in which he testified that he learned of Roy Reagan's involvement in the C–130a program from a government investigator in the summer of 1992. The deposition testimony is, of course, controlling. *See, e.g., Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991).

of abuses of the exchange program. Eitel Aff., ¶ 17.[4] Shortly thereafter, plaintiff made a Freedom of Information Act ("FOIA") request to obtain documents pertaining to the exchange program from the USFS. Plaintiff continued to pursue his FOIA request for a period of several months and eventually, in February 1992, obtained copies of the exchange agreements. Eitel Aff., ¶ 18–21.

Plaintiff asserts that in early 1992, an OIG investigator told him that his hotline complaint "related to what was now a full-blown audit of the Forest Service air tanker program." Eitel Aff., ¶ 23. He alleges that he cooperated with the investigation, relaying information Chisum told him and providing copies of documents he obtained through the FOIA requests. Ultimately, in August 1992, the OIG issued an audit report that was critical of the exchange program.

In late 1992, plaintiff contacted Congressman Charles Rose's office, the then chair of the House Agriculture Subcommittee on Specialty Crops and Natural Resources, and in early August 1993, testified in a public hearing before the Subcommittee.[5] Eitel Aff., ¶¶ 26, 31. Plaintiff also asserts that during the early part of 1993, he cooperated with several news reporters and an agent in the criminal section of the OIG office, sharing information and documents.

In their motions to dismiss, the defendants uniformly contend that plaintiff's claims are based on allegations or transactions previously publicly disclosed and that he was not the "original source" of the information. If so, this court lacks subject matter jurisdiction over this action. *See* 31 U.S.C. ¶ 3730(e)(4)(A).

### ANALYSIS

#### A. *Standard of Review*

■ Plaintiff bears the burden of establishing subject matter jurisdiction. *U.S. v.*

*Northrop Corp.,* 5 F.3d 407, 409 n. 5 (9th Cir.1993); *United States ex rel. Eitel v. Evergreen Intern. Airlines, Inc.,* 886 F.Supp. 750, 752 (W.D.Wash.1995). Where, as here, "'the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary.'" *Eitel v. Evergreen,* 886 F.Supp. at 752, *quoting Thornhill Pub. v. General Telephone & Electronics,* 594 F.2d 730, 733 (9th Cir.1979). In *Thornhill,* the Ninth Circuit explained that the standards applicable to a "speaking motion" under Rule 12(b)(1), *i.e.,* a factual rather than facial attack on subject matter jurisdiction, "differ greatly from the standards for ruling on a motion for summary judgment," and that when faced with a factual attack on subject matter jurisdiction:

> "the trial court may proceed as it never could under Rule 12(b)(6) or Fed.R.Civ.P. 56. * * * [N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

594 F.2d at 733, *quoting Mortensen v. First Federal Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977); *see also Eitel v. Evergreen,* 886 F.Supp. at 752 (citation omitted).[6]

Because the burden of establishing jurisdiction rests with plaintiff, I must, in effect, "presume[ ] lack of jurisdiction until plaintiff proves otherwise." *See* William W. Schwarzer, A. Wallace Tashima, & James M. Wagstaffe, *Federal Civil Procedure Before Trial* § 9:77 at 9–15 (1994), *citing Stock West, Inc. v. Confederated Tribes,* 873 F.2d 1221, 1225 (9th Cir.1989).

#### B. *The False Claims Act*

■ The FCA provides penalties for one who "knowingly presents * * * a false or

---

**4.** Plaintiff testified in deposition, however, that his hotline complaint only pertained to Fred Fuchs, a USFS employee. *See* footnote 3, *supra.*

**5.** Plaintiff's testimony, however, primarily focused on an alleged air tanker program involving A–10 fighter jets, not the C–130A and P–3A exchanges at issue in this case.

**6.** In contrast, if the factual issues raised in a Rule 12(b)(1) motion are intertwined with the merits of the case such that "resolution of the jurisdictional facts is akin to a decision on the merits," the court should employ the standard applicable to summary judgment and hold an evidentiary hearing to resolve any material factual disputes. *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir.1983).

fraudulent claim" to the government and provides incentives to whistleblowers who expose the fraud. 31 U.S.C. §§ 3729(a) and 3730. Before commencing a *qui tam* suit, the plaintiff must disclose his or her evidence of fraud to the government, which then has 60 days to intervene in the suit. 31 U.S.C. § 3730(b). If the government declines to intervene, as occurred in this case [7], the plaintiff may proceed with the suit as the government's assignee, provided the action is not precluded by one of the jurisdictional bars set forth in section 3730(e) of the FCA. *See Wang v. FMC Corp.*, 975 F.2d 1412, 1415 (9th Cir.1992).

■ The jurisdictional bar at issue in this case is section 3730(e)(4), which provides:

(A) *No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions* in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, *unless the action is brought by* the Attorney General or the person bringing the action is *an original source of the information.*

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information. (Emphasis added.)

By its own terms section 3730(e)(4)(A) comes into play only when a public disclosure of allegations or transactions has occurred. *Eitel v. Evergreen*, 886 F.Supp. at 753, *citing Wang*, 975 F.2d at 1416. Thus, only if public disclosure has occurred must the court determine whether the plaintiff is an "original source." *Id.*

In this case, plaintiff concedes that the "allegations or transactions" of fraud alleged in his complaint have been publicly disclosed.[8] Accordingly, plaintiff's *qui tam* suit is barred unless he can show that

(1) he has "direct and independent knowledge of the information on which his allegation is based"; and (2) that he "has voluntarily provided the information to the Government before filing" his *qui tam* action. *Wang*, 975 F.2d at 1417, *quoting* 31 U.S.C. § 3730(e)(4)(B).

In enacting the 1986 amendments to the FCA, which included current section 31 U.S.C. § 3730(e), Congress intended to require that the relator in a *qui tam* action be "the original source of the *government's* information." *Wang*, 975 F.2d at 1419 (emphasis in original). As the court in *Wang* explained:

The paradigm *qui tam* plaintiff is the "whistleblowing insider." * * * *Qui tam* suits are meant to encourage insiders to blow the whistle on the crime. In such a scheme, there is little point in rewarding a second toot. *Wang* 975 F.2d at 1419 (citation omitted).[9]

In *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir.1995), the Ninth Circuit recently commented that in crafting the jurisdictional provisions of the FCA, " 'it is clear that Congress attempted to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior.' " *Green*, 59 F.3d at 964 (citation omitted).

In their motions to dismiss, the defendants argue that plaintiff did not have the requisite "direct and independent knowledge" concerning the alleged fraudulent activity to qualify him as an original source. In *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699 (8th Cir.1995), the Eighth Circuit explained that "direct knowledge" has been defined as " 'marked by absence of an intervening agen-

---

7. The government filed notice of its decision not to intervene in this case on June 1, 1995 (# 129).

8. Relator's Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss, at 19 n. 4.

9. The *Wang* court also explained that *"all* those who 'directly or indirectly' disclose an allegation might qualify as its original source. * * * Anyone who helped to report the allegation to either the government or the media would have 'indirectly' helped to publicly disclose it." *Wang*, 975 F.2d at 1419 (citation omitted; emphasis in original).

cy.'" *Barth,* 44 F.3d at 703, *quoting U.S. ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 656 (D.C.Cir.1994). Similarly, in *Wang,* the Ninth Circuit explained that "direct knowledge" is "unmediated by anything but [the plaintiff's] own labor." 975 F.2d at 1417; *see also Green,* 59 F.3d at 966 n. 11 (the FCA's jurisdictional provisions preclude "suits by opportunists who lack first-hand knowledge of the fraud").

■ With respect to the separate requirement of "independent" knowledge[10], the cases interpreting section 3730(e)(4) indicate that a *qui tam* plaintiff does not have "independent" knowledge unless the knowledge is not dependent on public disclosure. *See U.S. ex rel. Fine v. Chevron, U.S.A., Inc.,* 39 F.3d 957, 961 (9th Cir.1994); *Houck on Behalf of U.S. v. Folding Carton Admin.,* 881 F.2d 494, 505 (7th Cir.1989).

■ Based on the evidence presented in this case, I find that plaintiff derived his information from other sources, primarily publicly available sources, and did not have the required first-hand knowledge. Plaintiff first learned of the USFS exchange program in the summer of 1991 from an article published in the magazine *Conservation Aeronautics.* In later discussions with representatives of the USFS and through the USFS' responses to his FOIA requests, plaintiff learned that C–130A and P–3A aircraft had been transferred to the defendant contractors during 1988 and 1989. He also learned, in late 1991, that the exchange program was "on hold."

The evidence shows that one of the reasons the exchange program was "on hold" was that as early as March 1991, the use of aircraft outside the United States was discovered and challenged. Two of T & G's C–130As had been sent to Kuwait following the Persian Gulf War, a use initially endorsed by the United States State Department. On March 1, 1991, the National Air Carrier Association, Inc. ("NACA"), on behalf of certain clients, sent a letter of complaint to the USFS. Among other things, NACA's letter identified the owner of the aircraft as T & G, identified several (allegedly improper) transfers in the chain of title for the aircraft, including transfers to defendants Reagan and William Grantham, and, in essence, accused T & G of violating the exchange agreement. In addition, on April 5, 1991, NACA notified the Secretary of Agriculture that T & G allegedly was offering three C–130A aircraft for sale overseas through a Middle–East broker. Thus, it appears that by the time plaintiff *first learned* of the exchange program, the program and at least some of the program participants already were the targets of criticism and investigation.[11]

Plaintiff alleges that his telephone call to the agency hotline "initiated" the 1992 OIG audit, but the evidence does not support his allegation. By the time plaintiff first contacted the USFS, the program was under scrutiny, prompted, at least in part, by NACA's complaint about the use of aircraft in Kuwait. Indeed, one of the newspaper articles for which plaintiff claims to be the source states:

It was Grantham who in May 1991 used two of the C–130As he purchased from Reagan to fly pollution control equipment to Kuwait in the aftermath of the Persian Gulf conflict. When T & G's aircraft were spotted on the ground in Kuwait, competing air cargo companies vehemently protested. The National Air Carriers Association, a trade group of large air cargo haulers, complained that T & G was running planes abroad that were supposed to be restricted to firefighting uses in the United States.

*The protests prompted the Federal Aviation Administration and eventually the Agriculture Department to investigate.* Memorandum in Support of Motion to Dismiss, Exhibit C (Jeff Manning's March 15, 1993, article published in The Business Journal–Portland) (emphasis added).

---

**10.** *See U.S. ex rel. Stinson v. Prudential Ins.,* 944 F.2d 1149, 1160 (3rd Cir.1991) ("'[relator's] argument overlooks the significance of the conjunctive 'and' in the statutory phrase 'direct *and* independent'") (emphasis in original).

**11.** The audit report itself reveals that information concerning the contractors' alleged "cannibalizing" of aircraft was known to and investigated by government investigators before plaintiff even placed his hotline call.

Moreover, plaintiff admitted in deposition that he first learned of Reagan's involvement in putting together the C–130A exchanges from a government investigator in the summer of 1992, long after his telephone call to the hotline, and long after the OIG audit was well under way.[12] He also concedes that he did not receive copies of the exchange agreements, which contain defendants' allegedly false certifications concerning the intended use of the aircraft and which form the basis of many of plaintiff's allegations, until after he made the hotline call. In view of those concessions, I agree with defendants that at the time he made his hotline call to the OIG, plaintiff could not have disclosed the information he claims to have disclosed concerning Reagan's involvement or the defendants' alleged violation of the terms of the exchange agreements.

In summary, the evidence does not persuade me that plaintiff had the required direct and independent knowledge of the information on which his allegations are based. To the contrary, it appears that nearly all of plaintiff's information came from public sources: documents obtained directly from the USFS through his FOIA request; government investigators; and published news articles. Although plaintiff possibly had direct and independent knowledge concerning Reagan's alleged plan to convert A–10 aircraft to air tanker use, this action is not based on that information and that information is, therefore, not relevant to the "original source" determination. See 31 U.S.C. § 3730(e)(4)(B). Moreover, to the extent plaintiff learned any information from Chisum, Grantham, or some unidentified "rogue CIA agent," plaintiff's knowledge was second-hand and does not qualify as "direct." See Barth, 44 F.3d at 703 ("a person who obtains secondhand information from an individual who has direct knowledge does not himself possess direct knowledge"); see also Green, 59 F.3d at 966 n. 11 (the jurisdictional provisions preclude suits by opportunists who lack first-hand knowledge).

In light of the record before me, I concur with Judge Zilly's assessment in Eitel v. Evergreen, that "[p]laintiff appears to be

12. See footnote 3, supra.

nothing more than a 'second toot.'" 886 F.Supp. at 756, quoting Wang, 975 F.2d at 1419. Plaintiff has failed to demonstrate that he was an original source of the information pertinent to his qui tam suit and has not, therefore, met his burden of establishing subject matter jurisdiction. Accordingly, defendants' motions to dismiss are GRANTED.

### CONCLUSION

Defendants' motions to dismiss (# # 142, 145, 146, 147, and 152) are GRANTED. Defendants' requests for attorney fees and costs are DENIED.