**HAWKINS AND POWERS AVIATION, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 98–109 C.**

United States Court of Federal Claims.

Feb. 10, 2000.

John J. Fausti, Washington, DC, for plaintiff. Wendy Nevett Bazil, Washington, DC, of counsel.

Michal L. Tingle, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, and Anthony H. Anikeeff, Assistant Director, Civil Division, Department of Justice, Washington, DC, for defendant.

*OPINION AND ORDER*

HEWITT, District Judge.

This matter comes before the court on Defendant's Motion for Summary Judgment. Defendant seeks summary judgment on the ground that it cannot be bound in contract where the Forest Service of the United States Department of Agriculture (Forest Service or government) lacked actual authority to act in accordance with the contract terms alleged by plaintiff. Defendant's Motion for Summary Judgment (Def.'s MSJ) at 1. Defendant also submits that plaintiff's claim of an implied-in-fact contract was not presented to the contracting officer. Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Def.'s Reply) at 8. That argument, if correct, would defeat this court's subject matter jurisdiction under the Contract Disputes Act (CDA). *Id.* Plaintiff, Hawkins and Powers Aviation, Inc. (Hawkins), asks the court to deny summary judgment because defendant has incorrectly or incompletely stated the issues in the case and because genuine issues of material fact exist which can be more fully developed through discovery. Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Pl.'s Opp.) at 1. In response to defendant's suggestion of lack of jurisdiction, plaintiff argues that it recited facts in a claim letter to the Forest Service sufficient to support this court's jurisdiction under the CDA. Plaintiff's Reply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Pl.'s Reply) at 7. For the following reasons, the government's motion for summary judgment is GRANTED.

## I. Background [1]

Plaintiff is a Wyoming-based company that provides aerial firefighting services. Plaintiff has contracted from time to time since the late 1960s with the Forest Service to

---

[1] Unless otherwise noted, all of the facts listed in the "Background" section were presented by plaintiff in its Complaint filed on February 11, 1998. This is plaintiff's second complaint filed before the United States Court of Federal Claims related to the same transaction. *See Hawkins* *and Powers Aviation, Inc. v. United States*, No. 95–316C. As discussed below, plaintiff voluntarily dismissed its previous complaint on February 2, 1996 because it had failed to file a CDA claim with the contracting officer. *See infra* note 5 and accompanying text.

provide air tankers for fire prevention and suppression. Plaintiff's Supplemental Brief (Pl.'s Supp.) at 2. *See, e.g.,* Appendix to Pl.'s Opp. (Pl.'s App.) at 35. The use of air tankers for fire prevention and suppression began in the early 1950s.

The majority of the post-World War II air tankers used in aerial firefighting were equipped with reciprocating engines.[2] These include the P–2 aircraft, which was manufactured with two reciprocating engines. Reciprocating engines are no longer manufactured and replacement parts are in dwindling supply. By replacing the reciprocating engines with turbine engines,[3] the useful service life of certain post-World War II air tankers can be extended by approximately 20 years.

Plaintiff is experienced in the use of the P–2 aircraft as an air tanker for fire prevention and suppression. Sometime prior to October 1990, plaintiff and employees of defendant engaged in discussions about the possibility of replacing the two reciprocating engines of the P–2 aircraft with two turbine turboprop engines to produce a hybrid aircraft to be called the P–2T. The parties identified P–3 aircraft owned by the government as a source for suitable turbine turboprop engines. The parties also discussed other modifications that would be feasible and desirable for the hybrid aircraft.

The benefits of the modification include significantly lighter aircraft weight and an increased capacity to carry fire retardant. The modified aircraft would also have faster cruise speeds, greater reserved power for emergencies, better fuel efficiency, and a variable payload capability that would enable it to be operated at fire base locations not previously accessible due to the P–2's heavier weight.

Hawkins claims that the government "agreed in or about November 1990(a) to provide Government surplus P–3 aircraft to plaintiff to be used as parts for installation and modification, and then used to modify plaintiff's P–2 aircraft which had been earmarked for this purpose; (b) to utilize the P–2T aircraft in its firefighting activities, on condition that the proposed aircraft meet certain design criteria, and all other usual contracting provisions, terms and conditions were satisfied." Complaint at ¶ 9.

In an apparent effort to obtain surplus P–3 aircraft under the now defunct Historic Aircraft Museum Exchange Program (the exchange program),[4] on February 24, 1990 the Forest Service requested from the General Services Administration (GSA) "a deviation under FPMR 101–46.002 to exchange . . . up to 12 Lockheed P–3A aircraft obtained from the Navy." Appendix to Def.'s MSJ (Def.'s App.) at 17. On August 16, 1990, GSA failed to approve the Forest Service's request for a deviation. *Id.* at 20, 26.

Plaintiff had many discussions about its proposal with Mr. Fred Fuchs, who was at the time the Assistant Director of the Forest Service for Fire and Aviation Management. On or around November 6, 1990, Mr. Fuchs directed plaintiff to pick up three aircraft for the proposed modification project, two of them within the month. Hawkins picked up two aircraft and flew them to Wyoming with the assurance of Mr. Fuchs that title to the aircraft would follow.

---

2. A reciprocating engine is an engine "in which the crankshaft is turned by pistons moving up and down in a cylinder." *The American Heritage Dictionary of the English Language* 1509 (3d ed.1996).

3. A turbine engine is an engine "in which the kinetic energy of a moving fluid is converted to mechanical power by the impulse or reaction of the fluid with a series of buckets, paddles, or blades arrayed about the circumference of a wheel or cylinder." *The American Heritage Dictionary of the English Language* 1926 (3d ed.1996).

4. During the 1980s, Hawkins received surplus military aircraft from the Forest Service in exchange for specified aircraft to be placed in museums under the exchange program. *See* Pl.'s App. at 3 (Affidavit of Duane Powers and supporting exhibits). The exchange program was implemented by regulations specifying the types of exchanges permitted and the uses allowable for the exchanged aircraft. *See* 40 U.S.C. § 486(c) (1994) (authority of Administrator of General Services to prescribe regulations); 41 C.F.R. § 101–46.000 (1991) (last amended 1998). Pursuant to the regulations, an agency could request a deviation from the regulations which could only be granted by the Administrator of General Services. 41 C.F.R. § 101–46.002.

Through the end of 1990 and during 1991, plaintiff corresponded with Mr. Fuchs and others at the Forest Service to keep them apprised of the progress of the P–2T project. In a November 20, 1991 letter to the director of Procurement and Property of the Forest Service, Mr. Fuchs notes that after Hawkins picked up the aircraft he "told them that the aircraft were government property and could not be used by them until some agreement could be completed." Pl.'s App. at 49.

Plaintiff claims that during 1992 it was assured repeatedly about continuing with the project. Plaintiff alleges that "the contracting officer, Mr. Denker, expressly told plaintiff that he had been instructed by his superiors to resolve the Government's method to transfer the P–3 aircraft, and that plaintiff was not to stop work...." Complaint at ¶ 14.

The government supplied no additional aircraft to Hawkins, nor did the government ever transfer title to the two aircraft in Hawkins' possession. Plaintiff alleges that the government breached the agreement in late 1994 or early 1995 by failing to provide title to the surplus P–3 aircraft. Complaint at ¶ 17. Plaintiff gives no reason for the choice of these dates as the dates of the government's breach.

Plaintiff filed a prior suit against the government in this court on April 27, 1995 alleging that it entered into an express "oral agreement" that the government would "supply surplus P–3 aircraft, and plaintiff would pay for all research and development and modification costs ...." 1995 complaint at ¶ 9. At that time plaintiff alleged that writings reflecting the terms of this express oral agreement were contained in government files that had not been produced. Id. at ¶ 12. Plaintiff further alleged that the government breached its express oral agreement by fail-

ing to supply the surplus P–3 aircraft. Id. at ¶¶ 11, 14. Plaintiff voluntarily dismissed its 1995 complaint without prejudice after it appeared that plaintiff had failed to file a CDA claim with the contracting officer prior to bringing suit.[5]

Thereafter, on January 7, 1997, Hawkins filed a written claim for CDA damages with Mr. Michael Dombeck,[6] the Chief of the Forest Service (Pl.'s Claim Letter). Plaintiff's Claim Letter mirrored its 1995 complaint. It stated:

> On or about October 15, 1990, the United States Forest Service and the United States Government, ("Government") and Hawkins & Powers Aviation, Inc., ("Claimant") entered into an agreement, which provided that the Forest Service would supply surplus P–3 aircraft, and that Claimant would pay research, development and modification costs ... for the conversion of its P–2 aircraft into a new type of airtanker, called the P–2T.

Pl.'s Claim Letter at 1. The Forest Service did not issue a response to Hawkins' Claim Letter. Complaint at ¶ 18. Plaintiff filed its current Complaint with this court in 1998. Plaintiff's current Complaint is substantially similar to its 1995 complaint.

Hawkins maintains that its agreement with the Forest Service was made "in or about November, 1990," but adds the following language to the language of the 1995 complaint: "these implied terms were well known to all." Complaint at ¶ 9.[7] Hawkins has deleted the word "oral" from the description of the agreement allegedly entered into in 1990. Id. at ¶ 10. Hawkins has added a more detailed discussion of its communication with the government about work on the aircraft modernization project and adds allegations that Mr. Denker, a contracting officer, instructed Hawkins not to stop work on the P–

---

5. Plaintiff initially claimed that its voluntary dismissal was solely because of its inability to obtain discovery due to a related criminal suit involving Mr. Fuchs. Plaintiff now concedes "the fact that subject matter jurisdiction was apparently one of the bases, if not the primary basis, for [plaintiff's] voluntary dismissal." Pl.'s Reply at 5, n. 3.

6. Although its Claim Letter was addressed to Michael Dombeck, plaintiff never alleges that he was the contracting officer for the alleged agree-

ment which is the subject of its current Complaint.

7. In addition to the differences noted in the text, the most significant difference between the complaints is that the current Complaint does not contain a second claim for relief entitled "Specific Performance." Compare 1995 complaint at ¶¶ 16–19 with Complaint.

2T. *Id.* at ¶ 14. The breach now alleged is that the government failed "to provide title to the surplus P–3 aircraft," *Id.* at ¶ 17, whereas the 1995 complaint alleged that the breach occurred when the defendant "refus[ed] to provide any other P–3 aircraft to plaintiff." 1995 complaint at ¶ 11.[8] Plaintiff seeks damages in excess of $1.5 million for its research and development costs, lost profits and loss of related income. *Id.* at ¶ 19. Only in its briefing does plaintiff suggest its most recent theory of the case: that even if the agreement was initially formed with an unauthorized employee, it was later ratified by an authorized government employee. *See* Pl.'s Opp. at 23, 25. Plaintiff's full articulation of its current theory of ratification occurred only at oral argument in response to questions of the court. *See* Transcript of Oral Argument held on November 22, 1999 (Tr.) at 12, 17, 21, 62.

## II. Discussion

### A. Jurisdiction

The Supreme Court recently restated in *Steel Company v. Citizens for a Better Environment* that determining whether subject matter jurisdiction exists is an inflexible threshold matter. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)); *see also Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 89 (1989) (citing *Hambsch v. United States*, 857 F.2d 763, 765 (Fed.Cir.1988)). Accordingly, this court addresses the jurisdiction issue first.

The government contends that Hawkins' claim of an implied contract falls outside of the court's jurisdiction because it has not yet been properly presented or certified to the contracting officer for a final decision as required by 41 U.S.C. § 605(a) (1994).[9] Def.'s Reply at 8. *See Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 858 (Fed.Cir. 1987). Hawkins argues that "the only thing that has even arguably changed is H & P's adoption of an implied-in-fact contract theory." Pl.'s Reply at 7.

█ The law is well settled that disputes brought to the court under the CDA must first be submitted in writing to the contracting officer. *See id.; see also Spirit Leveling*, 19 Cl.Ct. at 90–91 (denying contractor recovery because claim was different from that submitted to contracting officer).

As an initial matter, the court notes that Hawkins' Claim Letter was not submitted to the contracting officer for the alleged agreement reached with Hawkins on the P–2T project. *See* Pl.'s Claim Letter at 1. The Claim Letter was addressed to Mr. Michael Dombeck, Chief, United States Forest Service.[10] In plaintiff's complaint, Mr. Denker is designated as the contracting officer. Complaint at ¶ 14. Recently, plaintiff has alleged that Mr. Ron Hooper was also "a contracting officer." Pl.'s Opp at 10; Tr. at 15. The submission of the Claim Letter, which is a condition precedent to this court's jurisdiction, was not addressed to either of the individuals now alleged to have been the contracting officer for the alleged agreement. Not only is the Claim Letter not addressed to the relevant government official, the substance of the agreement alleged in the letter is materially different from what plaintiff has argued before the court.

█ The Court of Appeals for the Federal Circuit has determined that, as a jurisdictional requirement, the contractor must "submit in writing to the contracting officer a

---

8. Plaintiff presents two bases for breach in its Claim Letter stating that the Forest Service: (1) failed to "transfer clear title of the two P–3 aircraft already provided;" and (2) failed "to provide the company with P–3 aircraft." Pl.'s Claim Letter at 1. The Claim Letter therefore encompasses the breaches alleged in both the 1995 complaint and the current Complaint.

9. Under 41 U.S.C. § 605(a), "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (1994).

10. The Forest Service did not respond to plaintiff's January 7, 1997 Claim Letter. *See* Complaint at ¶ 18. This lack of response constitutes a denial of the claim under the CDA. 41 U.S.C. § 605(c)(5).

clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987). The contractor has the right on appeal to increase the amount of its claim; but the contractor may not raise any new claims not presented and certified to the contracting officer. *See Santa Fe,* 818 F.2d at 858; *AAI Corp. v. United States,* 22 Cl.Ct. 541, 544 (1991). A new claim is one that does not arise from the same set of operative facts as the claim submitted to the contracting officer. *See Tecom, Inc. v. United States,* 732 F.2d 935, 936–37 (Fed.Cir.1984); *SMS Data Prod. Group, Inc. v. United States,* 19 Cl.Ct. 612, 615 (1990) (citing *Glenn v. United States,* 858 F.2d 1577, 1580 (Fed.Cir.1988)); *see also Foley Co. v. United States,* 26 Cl.Ct. 936, 940–41 (1992), *aff'd* 11 F.3d 1032 (Fed.Cir.1993); *AAI Corp.,* 22 Cl.Ct. at 545; *Spirit Leveling,* 19 Cl.Ct. at 91.

The relevant determination is whether the claim Hawkins submitted was a clear and unequivocal statement that put the agency on sufficient notice of the basis for the claim currently before the court. *See Contract Cleaning,* 811 F.2d at 592. In its January 7, 1997 Claim Letter Hawkins stated:

> On or about October 15, 1990, the United States Forest Service and the United States Government, ("Government") and Hawkins & Powers Aviation Inc., ("Claimant") *entered into an agreement,* which provided that the Forest Service would supply *surplus* P–3 aircraft, and that Claimant would pay research, development and modification costs, and use its own P–2 aircraft, of which it had 13 in its fleet, for the conversion of its P–2 aircraft into a new type of airtanker, called the P–2T.

Pl.'s Claim Letter at 1 (emphasis added).

█ The Claim Letter gave no notice of the claim that Hawkins has most recently urged before this court—that its agreement with the Forest Service was "one that evolved over time" (Pl.'s Reply at 6) and involved a ratification.[11] *See* Pl.'s Claim Letter at 1. The basis for Hawkins' current claim is an evolving relationship that allegedly constituted an implied-in-fact contract where the governmental employee with whom plaintiff initially made the agreement was not authorized and where the unauthorized agreement was later ratified by authorized personnel. The court views the evolving relationship and ratification basis for Hawkins' claim as an "operative fact" in the contracting officer's assessment of whether the government is liable for damages. *See Foley,* 26 Cl.Ct. at 941. Altering the factual basis of the claim from an express agreement entered into on October 15, 1990 to an implied-in-fact contract that evolved over several years and was authorized by ratification significantly changes the nature of the claim. And this change could be viewed as a failure to provide notice to the agency as required by law. *See* 41 U.S.C. § 605(a); *Contract Cleaning,* 811 F.2d at 592.

Notwithstanding the significant differences between the Claim Letter and the current Complaint, there are two factors which weigh in favor of finding jurisdiction. First, the Claim Letter clearly stated as one of two bases for the government's claimed breach the same breach alleged in the current Complaint—that the government failed to transfer title to the aircraft to plaintiff.[12] Second, there is some uncertainty as to whether in a case where, as here, the agency has not responded to a claim, the purpose of the CDA to permit the agency the opportunity to respond is frustrated in a way which destroys jurisdiction. *See Cerberonics, Inc. v. United States,* 13 Cl.Ct. 415, 418 (1987) (stating that the "critical test appears to be whether the scheme of adjudication pre-

---

**11.** The change in or augmentation of plaintiff's claim from an express agreement made on or about October 15, 1990 to an implied agreement established over time appears to the court to be an attempt to avoid the difficulty presented by the fact that Mr. Fuchs (the only government official alleged to have been discussing the project with Hawkins on or about October 15, 1990) lacked the authority to form a binding contract on behalf of the government. It is clear from plaintiff's Claim Letter and the transformation of its argument that plaintiff is unsure of the identity of the contracting officer on any alleged agreement. *See* Pl.'s Claim Letter at 1; Tr. at 6–8, 11–13, 40–45.

**12.** *See supra* note 8 and accompanying text.

scribed by the CDA is undermined by the contractor's claim on appeal ...."). While in some cases this court has stayed proceedings and remanded the matter back to the contracting officer for consideration of an unanswered claim letter, *see, e.g., Durable Metal Prods., Inc. v. United States,* 21 Cl.Ct. 41, 46 & n. 4 (1990), the court declines to take that step in this case because the plaintiff's implied-in-fact contract and ratification claims fail on the merits.

### B. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Rules of the United States Court of Federal Claims (RCFC) 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Dept. of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Determining which facts might affect the outcome of the suit depends on the substantive law that applies to the case. *See H.B. Zachry Co. v. United States,* 28 Fed.Cl. 77, 80 (1993), *aff'd,* 17 F.3d 1443 (Fed.Cir.1994). The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Industrial Products, Inc. v. Solid State Systems Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *See H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir. 1984). However, "[a] party cannot defeat summary judgment by instigating controversy with its own position on the facts ...." *Monarch Painting Corp. v. United States,* 16 Cl.Ct. 280, 289 (1989) (citing *Sohm v. United States,* 3 Cl.Ct. 74, 77–78 (1983)).

Summary judgment is appropriate in the case before the court because:

One of the purposes of a motion for summary judgment is to determine whether or not the opposing party has evidentiary support for his version of the facts. *Crawford v. United States,* 3 Cl.Ct. 323, 328 (1983). A party opposing summary judgment "must do more than whet the curiosity of the court; he must support vague accusation and surmise with concrete particulars." *Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96 (2d Cir.1970). *See also Crawford v. United States,* 3 Cl.Ct. at 328–29.

*Gratkowski v. United States,* 6 Cl.Ct. 458, 462 (1984).

Assuming, as we do, that plaintiff's implied-in-fact contract and ratification claims are properly before this court, defendant is entitled to summary judgment because failure to establish each and every element of the claim "necessarily renders all other facts immaterial and entitles the moving party to summary judgment." *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994).

Plaintiff has the burden of establishing the existence of a mutual intent to contract as evidenced by an unambiguous offer and acceptance, consideration and a government representative who possessed actual authority to bind the government. *See Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1434 (Fed.Cir.1998), *cert. denied,* 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999); *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *Howard v. United States,* 31 Fed.Cl. 297, 312 (1994).

### 1. There Was No Agreement Under the Exchange Program

Plaintiff has contended that it made an agreement on October 15, 1990 with Fred Fuchs "to exchange certain firefighting aircraft, through the Exchange Program, for the P–3 aircraft...." Def.'s App. at 37–39. There is some evidence [13] that plaintiff en-

**13.** The court and the parties rely on discovery pursuant to the 1995 complaint. *See, e.g.,* Pl.'s Opp. at 19, n.7; Def.'s MSJ at 2, n.3. This reliance is appropriate because of the same underlying facts and substantial similarity of the 1995 complaint to the current Complaint. *See Janowsky v. United States,* 133 F.3d 888, 889, n. 2 (Fed.Cir.1998) (citing Fed.R.Evid. 201); *see also supra* text accompanying note 7.

tered into an agreement with Fred Fuchs of the Forest Service in October 1990 to receive surplus P–3 aircraft for use in modifying P–2 engines in exchange for specified aircraft the government desired.[14] There is also evidence that the Forest Service and Hawkins had executed previous agreements under the exchange program. Pl.'s App. at 27–35. Plaintiff argues that this evidence shows a mutual intent to contract and consideration. The deposition testimony given by Mr. Gene Powers, co-owner and director of Hawkins, during discovery pursuant to the 1995 complaint provides, at best, ambiguous support for plaintiff's contention:

> Q: Did you, Hawkins & Powers, promise to the Forest Service at any time that in exchange for the Forest Service giving Hawkins & Powers the two P–3 aircraft that are now at Greybull, that Hawkins & Powers in return would give the Forest Service some aircraft that qualified?
>
> A: Yes.
>
> Q: Okay. What did you agree to give them?

A: I did not get it defined. Something on the list that would satisfy the agreement and the letter that they put out in accordance with how they would run their historical exchange program, which contains a list of aircraft that are suitable. And just as the 130 trade went, whatever they said, if and when they got all of their ducks in a row.

Def.'s Supplemental Appendix (Def.'s Supp. App.) at 19–20.[15] Even giving plaintiff the benefit of all possible favorable inferences supporting a mutual agreement to exchange aircraft, that agreement—alleged to have been made with Mr. Fuchs—was not made with a government official authorized to contract. Nor did anyone else at the Forest Service obtain the authority required to enter into an exchange agreement with plaintiff. Indeed, plaintiff has not even alleged the existence of such authority under the exchange program, much less supported the existence of such authority with any facts.

Instead, plaintiff has repeatedly argued that it believed Mr. Fuchs had the authority to contract for the government.[16]

---

**14.** In responding to the government's interrogatories, plaintiff claimed that it "started discussions with Fred Fuchs of the USFS in 1988–1989 about turbine P–2 using P–3 components.... [and the agreement was formed on] 10/15/90." Def.'s App. at 37–38.

**15.** Additional deposition testimony of Mr. Powers provides an equally uncertain and ambiguous description of the key terms of plaintiff's agreement:

> Q: I am trying to find out what other mechanisms could have been contemplated in this agreement.
> A: Contemplated. Well, I know what I contemplated, and I know what I discussed. I don't know what the Forest Service contemplated. I do know that at one time or another, and, you know, the Forest Service has contemplated auctions or sales or making those airplanes available just through a sale thing. And I think that's still a viable option somehow....
> Q: Was the Forest Service just going to give Hawkins & Powers the P–3s, or was it going to exchange the P–3s for other aircraft or something else?
> A: *That was never made positively clear.* They originally were going to exchange them because that was the viable way, or at least, now I said they were. I say it was my impression that they probably would do that under the exchange program because *that was the going mechanism that everything was happening then.* Had they done that, we had aircraft that we

had available that were pilotable and acceptable to them. And we certainly would have done that....

Def.'s Supp.App. at 21–22 (deposition of Gene Powers) (emphasis added). This testimony strongly supports the conclusion that if the agreement were not going to occur under the exchange program, the transfer mechanism of the agreement was undefined.

**16.** Plaintiff presents evidence of its previous course of dealing with Mr. Fuchs and others at the Forest Service to support its belief that it had a contract with the government. *See* Pl.'s Opp. at 5, 28; Pl.'s App. at 2, 4 ("act now, document later"); Tr. at 44 ("... a pervasive pattern of act now, document later that we had come to rely on ...."). Yet plaintiff asserts that it is "not arguing detrimental reliance," Tr. at 23, but rather that "authorized officials" told plaintiff that it had "a deal." *Id.* There were significant problems with the exchange program involving the Forest Service and its fire prevention and suppression activities. In 1995, an aviation consultant brought a qui tam action under the False Claims Act which alleged that certain aviation contractors, including Hawkins, had participated in the exchange program with the Forest Service in violation of law, including by presenting false claims and using aircraft obtained through the exchange program in violation of the program's terms. *Eitel v. Reagan*, 898 F.Supp. 734, 735 (D.Or.1995) (dismissed on jurisdictional

Tr. 11–12. Although private parties can be bound by the apparent authority of a contractor, the doctrine of apparent authority does not apply to contracts with the government. *See Freed v. United States*, 34 Fed. Cl. 715, 720 (1996); *Hoch v. United States*, 31 Fed.Cl. 111, 114 (1994); *see also* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 81 (3d ed.1998). The Supreme Court has held that "anyone entering into an arrangement with the Government takes the risk of *having accurately ascertained* that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383–84, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (emphasis added). *See, CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed.Cir.1993) (citing *Merrill*). Despite its burden to do so under the case law, plaintiff has simply not argued that it accurately ascertained that Mr. Fuchs had actual authority to bind the government in contract. Plaintiff argued that it believed Mr. Fuchs had the authority to contract for the government because of a letter they received from Mr. Amicarella "directing [Hawkins] to deal on these issues with Mr. F[uchs]," Tr. at 12,[17] but offered no evidence that Mr. Fuchs actually possessed such authority. Because plaintiff does not allege that Mr. Amicarella was the contracting officer, the allegation of his involvement only serves to show plaintiff's mistaken belief that Mr. Fuchs had authority. Tr. at 11.[18]

Even if Mr. Fuchs had been a properly warranted contracting officer, he would not have been able to complete the transaction except in compliance with the regulations governing exchanges of surplus property. *See supra* note 4 and accompanying text; 40 U.S.C. § 481(c). It appears that, when the

Forest Service realized that it could not itself transfer aircraft under the existing exchange regulations, the Forest Service requested a deviation from GSA. Def.'s App. at 17–19. The deviation was not granted. Def.'s App. at 20, 26. Plaintiff alleges that the Forest Service was "obligated" to pursue its request for a deviation further because the government had an agreement with plaintiff to provide the aircraft. Pl.'s Supp. at 10–11. However, the Federal Circuit made clear in *City of Alexandria v. United States*, 737 F.2d 1022 (Fed.Cir.1984), that, if the governmental actor fails to follow a provision of the law which grants authority to contract, no contract can be formed to bind the government. *Id.* at 1027 (finding no authority to contract because GSA failed to submit the proposed sale to a congressional committee as required by the "report and wait" provisions of the relevant statute); *see also Trauma Serv.*, 104 F.3d at 1325–26 (holding that plaintiff could not establish the existence of either an express or implied-in-fact contract because there was no allegation that the contract was presented for the required approval). These cases make clear that a governmental actor's failure to follow all steps required to exercise the authority results in the lack of authority necessary to bind the government.

2. There was No Contract Alternative to the Exchange Program

Plaintiff alleges that Mr. Denker told Hawkins that "he had been instructed by his superiors to resolve the Government's method to transfer the P–3 aircraft, and plaintiff was not to stop work on the P–2T." Complaint at ¶ 14. Even if government employees were searching for a "clean method of transfer to industry," Pl.'s App. at 52, that fact does not imply that authorization was ever found.[19] Plaintiff has failed to provide

grounds). There has also been a congressional investigation into the propriety of Forest Service actions under the exchange program. *See, e.g., Def.'s App.* at 23 (statement of Forest Service Chief before Committee on Agriculture); 1993 WL 760984 (Aug. 5, 1993) (testimony before Committee on Agriculture). None of these activities bears directly on Hawkins' current Complaint, but serve as examples of widely known difficulties with the Forest Service's administration of the exchange program. These difficulties provide a context within which to place plaintiff's assertion that it had "a deal" that was an enforceable government contract.

17. The name "Fuchs" was consistently misspelled "Fox" in the transcript.

18. Nor does plaintiff allege that the letter from Mr. Amicarella was a ratification of any previously unauthorized agreement between Hawkins and Mr. Fuchs. Tr. at 12.

19. Plaintiff has recently attempted to engraft its alleged agreement with the government to trans-

any evidence of the existence of an authorized alternative mechanism by which the Forest Service could have provided Hawkins with government aircraft outside the exchange program.[20]

Hawkins suggests that the Forest Service "could have made" the P–3s available as Government Furnished Property (GFP). Pl.'s Opp. at 7. Even if this method could somehow have been authorized, the result would not have been the transfer of title because with GFP title remains with the government. The Claim Letter clearly states that the government's breach is premised on its failure "to transfer title of the two aircraft that it had provided to Claimant." Pl.'s Claim Letter at 1. Because the government retains title to GFP, this "alternative method" would not create a transaction consistent with the agreement alleged in the Complaint or avoid the breach alleged in its Claim Letter and Complaint. *See* Complaint at ¶ 17; Pl.'s Claim Letter at 1.

Next, Hawkins suggests that the Forest Service could have made the P–3s available through an outright sale. Pl.'s Opp. at 7. However, under the relevant Federal Property Management Regulations (FPMR), the Forest Service had no authority to sell P–3s to private contractors such as Hawkins. 41 C.F.R. § 101–45.103–1 (1991). The relevant FPMR in effect at the time of the alleged agreement directed that: "each executive agency shall be responsible for making excess personal property available and for facilitating the transfer of the property to other Federal agencies ...." 41 C.F.R. § 101–43.302. After receiving reports that detail excess property, GSA is directed to attempt to redistribute property among Federal agencies who need the property. 41 C.F.R. § 101–43.301. Only after sixty days does the excess property become "surplus." 41 C.F.R. § 101–43.311–1. Even after the property is designated as surplus, it is not yet ready for public sale. GSA must make it available for donation to public agencies and specific nonprofit activities. 41 C.F.R. § 101–43.311–3. Only after this process is completed would the P–3s have been available for sale to Hawkins and then only by GSA under a competitive bidding regime. *See* 41 C.F.R. § 101–45.304–1; 41 C.F.R. § 101–45.103–1. The Forest Service could not have legally contracted to sell the P–3s to Hawkins.

Third, Hawkins suggests that "[p]erhaps the USFS could have put the planes into use for the one year required in 41 C.F.R. § 101–46.202(c)(10), prior to transfer...." Pl.'s Supp. at 10. Even if the Forest Service "could have" found a way around the existing property transfer regulations (and there is no evidence even suggesting that any circumvention would have been legal), the fact that the Forest Service did not do so further underscores the absence of actual authority. *See, e.g., City of Alexandria,* 737 F.2d at 1027; *Trauma Serv.,* 104 F.3d at 1325–26.

Finally, Hawkins suggests that the method of transferring the aircraft has yet to be discovered. Plaintiff urges that defendant's motion for summary judgment be denied because plaintiff's ability to conduct discovery about other possible legal methods of transferring the P–3 aircraft has been hampered by the criminal investigation of Mr. Fuchs. Pl.'s Supp. at 9 n.7.[21] But possible alternative mechanisms that would have allowed the transfer of the P–3 aircraft is a legal inquiry,

---

fer aircraft onto its ongoing fire suppression contracts. At oral argument, plaintiff's counsel made the following claims about Hawkins' dealings with Mr. Denker: "We talked to him because he was our Forest Service contracting officer.... Denker is a contracting officer on our existing contracts.... [W]e had a course of dealing.... So we had a proposal to the Forest Service that related to our existing contracts, and we discussed those and they were ratified by our existing contracting officer." Tr. at 41–43. Plaintiff's ratification theory is discussed in Part B.3, below.

20. The several alternative methods of transfer alleged by plaintiff all would have involved actions within the discretion of GSA. Pl.'s Opp. at 7. Plaintiff does not allege an agreement with or by GSA relating to the P–2T project.

21. Although plaintiff deposed Mr. Fuchs under its 1995 complaint, the deponent asserted his Fifth Amendment rights throughout the deposition. *See* Pl.'s Supp. at 9 n.7. The court notes that substantial discovery, including a number of depositions, has been conducted pursuant to both the 1995 complaint and the current Complaint.

not a factual issue that only Mr. Fuchs could illuminate. Even if Mr. Fuchs believed there was an authorized method outside of the exchange agreement, he had no contracting authority. His view of the relevant statutes and regulations would be neither authoritative nor binding on the government. *See Merrill*, 332 U.S. at 383–84, 68 S.Ct. 1; *CACI*, 990 F.2d at 1236.

An analogous inquiry was proposed by the plaintiff in *Gratkowski v. United States*, 6 Cl.Ct. 458 (1984). There the court stated, "The essence of plaintiff's position herein is that additional facts may show at trial that [the government agent] obtained actual authority to contract with plaintiff. But this conjecture is not enough to successfully oppose a motion for summary judgment." *Gratkowski*, 6 Cl.Ct. at 462. The Federal Circuit has also held that "[s]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed.Cir.1984).

### 3. There Was No Ratification of Any Agreement

■ In its briefs and at oral argument, plaintiff argued that even if the agreement between Hawkins and Fuchs was unauthorized, it was subsequently "ratified." [22] Plaintiff has offered two authorities in support of this proposition. First, it cited in its briefing *Janowsky v. United States*, 133 F.3d 888 (Fed.Cir.1998) as "stand[ing] for the proposition that institutional ratification is a viable concept and that an agency can ratify unauthorized actions of its employees by accepting the benefits received from the claimant." Pl.'s Opp. at 23. Second, and in response to the court's questioning at oral argument, plaintiff alluded to a ratification

case in the government contracts context that was not cited in any of plaintiff's briefing at that time. Tr. at 59–60. On December 1, 1999, plaintiff filed a Post Argument Brief (Pl.'s Post) directing the court's attention to *Dolmatch Group Limited v. United States*, 40 Fed.Cl. 431 (1998).

*Janowsky* involved two private citizens who assisted the Federal Bureau of Investigation in a sting operation and suffered financial losses as a result. *Janowsky*, 133 F.3d at 889–90. The *Janowsky* plaintiffs claimed that the United States breached an implied-in-fact contract authorized through institutional ratification. The Court of Federal Claims granted summary judgment for the government because plaintiffs "failed to establish the contracting authority of the government agent with whom they negotiated." *Janowsky v. United States*, 36 Fed.Cl. 148, 156–57 (1996). The Federal Circuit remanded the case because the trial court had not considered "whether the agency ratified the proposed contract with the [plaintiffs] by allowing the sting operation to continue and by receiving the benefits from it." *Janowsky*, 133 F.3d at 892. The Federal Circuit drew the lower court's particular attention to its decision in *City of El Centro v. United States*, 922 F.2d 816 (Fed.Cir.1990) where the plaintiff's claim of contract ratification was denied because the plaintiff "failed to show that *the government received a direct benefit* from the implied-in-fact contract." *Janowsky*, 133 F.3d at 892 (citing *El Centro*, 922 F.2d at 823) (emphasis added).

*Dolmatch* involved an alleged implied-in-fact contract between Dolmatch and the Smithsonian Institution (Smithsonian) pursuant to which the Smithsonian would pay commissions for sales by Dolmatch of videotapes of Smithsonian programs. Dolmatch negotiated the terms of the alleged contract with a

---

22. Plaintiff alleges several factual bases for its ratification argument, none of which has ever been found to support ratification in the authorities addressed in the .text or elsewhere, to the court's knowledge. These allegations include: ratification because many government employees "were aware of the facts from nearly the beginning of plaintiff's work on the P–2T project," Pl.'s Opp. at 26; ratification because Mr. Denker was the contracting officer for a solicitation issued in 1992 (RFP 49–92–07) for an aerial fire-

fighting services contract, Pl.'s Opp. at 9, Pl.'s App. at 54; ratification because of Mr. Denker's failure to order Hawkins to "stop" any work on the development of a P–2T during a visit to Hawkins' facility in conjunction with a 1992 solicitation for a different contract, Pl.'s Opp. at 10; and ratification because various governmental officials became involved in searching for a mechanism to transfer the P–3s to Hawkins, Pl.'s Opp. at 10.

Smithsonian employee who had no contracting authority. *Dolmatch,* 40 Fed.Cl. at 437. Some evidence was presented that another employee who possessed contracting authority was "involved" and "aware" of the alleged arrangement. *Id.* at 438. There was conflicting evidence as to whether this second employee was authorized to enter into an agreement on the terms alleged. *Id.* at 439. Dolmatch had effected at least one sale for which the Smithsonian had paid a commission on substantially the terms alleged by plaintiff. *Id.* at 436. The *Dolmatch* court denied the government's motion for summary judgment because of a possibility that the plaintiff might be able to prove institutional ratification. *Id.* at 439.

Hawkins argues here that the Forest Service's payment for ferrying the two Naval P-3s to Wyoming is analogous to the commission in *Dolmatch.* Pl.'s Post at 2. The court disagrees. The agreement alleged by Hawkins was not an agreement to receive a commission or, indeed, any monetary payment from the government. Hawkins has repeatedly argued that its performance under the agreement would be free of cost to the government. *See, e.g.,* Tr. at 9–10, 39. Evidence that Hawkins received money from the Forest Service for ferrying the aircraft does not provide, as the Dolmatch commission payment did, evidence of partial performance.

It is clear to the court that the holdings in *Janowsky* and *Dolmatch* were premised on performance of the agreement in accordance with the terms alleged, together with the government's acceptance of benefits. In contrast to the facts in *Janowsky* and *Dolmatch,* the case before the court contains no evidence that the government accepted or received benefits as a result of the performance of the alleged implied-in-fact contract. In fact, plaintiff admits that any benefits would all occur in the future. Pl.'s Supp. at 2 ("Both parties *would* benefit from the improved capability and lowered costs of aerial firefighting under *subsequent* Government contracts, as H & P would not have any costs of new aircraft to pass on to the Gov-

ernment." (emphasis added)). Moreover, because the aircraft always remained government property, it is undisputed that performance was never accomplished.

Hawkins' failure to establish all the essential elements of its claim "necessarily renders all other facts immaterial and entitles the moving party to summary judgment." *Dairyland Power Coop. v. United States,* 16 F.3d at 1202.[23]

### III. Conclusion

1. For the foregoing reasons, defendant's Motion for Summary Judgment is GRANTED. The Clerk of the Court is directed to enter judgment for defendant.

2. Each party shall bear its own costs.

IT IS SO ORDERED.

---

**23.** The court has carefully considered all points of argument advanced by plaintiff and not fully discussed in this opinion and has found them to be without merit.