PACIFIC HARBOR CAPITAL,
INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE and United States
Forest Service, Defendants.

Civ. A. No. 93–1255.

United States District Court,
District of Columbia.

Nov. 17, 1993.

Steven Carl Tabackman, Perkins & Coie, Washington, DC, for plaintiff.

Daniel F. Van Horn, U.S. Attys. Office, Washington, DC, for defendants.

## MEMORANDUM AND ORDER

BRYANT, Senior District Judge.

Plaintiff Pacific Harbor Capital (PHC) has requested a declaratory judgment that it is the rightful owner of two airplanes to which the defendants, the United States Department of Agriculture (USDA) and the United States Forest Service, also claim title. Plaintiff has moved for summary judgment, offering five counts on which this court may grant it relief: 1) Plaintiff was a good faith purchaser for value of goods originally purchased from a party with at least voidable title, and so plaintiff's title is protected under the Uniform Commercial Code;  2) section

203(d) of the Federal Property and Administrative Services Act (FPASA) guarantees its title to the planes; 3) the sale was "complete"; 4) the defendants waived their right to challenge plaintiff's title; and 5) the defendants are estopped from claiming title.

Defendants counter that plaintiff's title was void, and not voidable; that section 203(d) of the FPASA does not apply to property that the General Services Administration (GSA) did not determine to be surplus property; and that the government may not be estopped from denying the unauthorized and illegal acts of its agents. Defendants have in turn moved for summary judgment.

This court finds that section 203(d) of the FPASA protects plaintiff's title to the planes, and it therefore grants plaintiff's motion for summary judgment.

## FACTS

The United States Forest Service contracts with several companies for airtanker support of forest fire fighting. To reduce future contract costs and replace grounded and obsolete planes in the contractors' fleets, the Forest Service initiated its Historic Aircraft Exchange Program, whereby it would exchange planes that it had received from the Department of Defense (DOD) one for one for historic planes held by airtanker contractors, who would then modify the planes for use as airtankers.

In 1988 and 1989, pursuant to this program, the Forest Service exchanged several C–130 and P–3A airplanes for historic airtankers with five airtanker contractors. The Forest Service transferred six of these planes to contractor TBM, Inc., and executed bills of sale documenting the transfer of title, which were recorded in the Federal Aviation Administration (FAA) Registry. On June 21, 1989, and January 7, 1991, TBM transferred two of the C–130s to Roy Reagan as payment for his having acted as broker of the aircraft exchanges. Mr. Reagan sold these planes to T & G, another airtanker contractor. Based on assurances that Mr. Reagan would pass clear title in the planes to T & G, on January 22, 1991, the plaintiff in this case, PHC, loaned T & G $2.4 million so that T & G could purchase the two C–130s and eight planes that PHC had repossessed from a previous borrower. All ten planes secured the loan, about $1.1 million of which was earmarked for purchase and modification of the two C–130s. On January 25, 1993, T & G turned the two C–130s over to PHC after it had defaulted on the loan. PHC then attempted to sell the aircraft.

Meanwhile, in December 1989, the USDA Office of General Counsel issued a letter in which it questioned the legality of the aircraft exchanges. The USDA did not make the letter public, nor did it attempt to recover the airplanes. The Forest Service did cease further exchanges, however. In October 1992, after PHC had acquired a security interest in the two C–130s, the USDA Office of Inspector General published an audit of the aircraft exchange program that concluded that the Forest Service had no authority to exchange the planes. No agency or department of the government made any effort to recover the planes. On February 28, 1993, after T & G had relinquished its rights in the two planes to PHC and PHC offered the planes on the market for sale, the Forest Service wrote PHC a letter in which it advised PHC that the United States claimed an interest in the planes and that PHC should do nothing to prejudice the government's interest. The letter stated that the Forest Service was not authorized to exchange the C–130s and that the United States was not bound by the unauthorized acts of its agents.

The Forest Service's transfers of the planes were unauthorized because they were not in compliance with GSA regulations regarding exchanges and disposal of government property. First, the C–130s are arguably not historic to the Forest Service, 41 C.F.R. § 101–46.001–4 (1988), and the regulations require that both items exchanged be historic, *id.* § 101–46.203(b). Second, the Forest Service acquired the planes as excess property from DOD in order to exchange them immediately, and the regulations require that an agency, first, use property obtained as excess from another agency for one year before exchanging it, *id.* § 101–46.-202(c)(10), and, second, acquire property in order to use it and not in order to exchange it, *id.* § 101–46.202(b)(6). Finally, GSA nev-

er determined the planes to be surplus property pursuant to 41 C.F.R. § 101–43.311 (1988) and as required by 40 U.S.C. § 472(g) (1988).

## DISCUSSION

■ Section 203(d) of the Federal Property and Administrative Services Act (FPASA) protects bona fide grantees and transferees for value who receive government property and can point to an instrument documenting the transfer:

A deed, bill of sale, lease, or other instrument executed by or on behalf of any executive agency purporting to transfer title or any other interest in surplus property under this subchapter shall be conclusive evidence of compliance with the provisions of this subchapter insofar as concerns title or other interest of any bona fide grantee or transferee for value and without notice of lack of such compliance.

40 U.S.C. § 484(d) (1988).

In accepting the planes as security for its loans to T & G, the plaintiff relied on various assurances, including from counsel, that Roy Reagan would vest title to the planes in T & G. Plaintiff argues that the bills of sale, which were executed on behalf of the USDA and the Forest Service, are conclusive evidence that the USDA and the Forest Service complied with all provisions of the FPASA and that, pursuant to 40 U.S.C. § 484(d), its title to the planes is protected. *See United States v. Mailet*, 294 F.Supp. 761, 765–66 (D.Mass.1968) (holding that 40 U.S.C. § 484(d) protects second and third purchasers as bona fide transferees for value); *East Tennessee Iron & Metal Co. v. United States*, 218 F.Supp. 377, 378–79 (E.D.Tenn.1963) (holding that plaintiff who bought and obtained title to rutile ore that was not designated surplus could recover for its value after government seized it).

The defendants counter that 40 U.S.C. § 484(d) only protects title in property that is surplus as determined by the General Services Administration (GSA) pursuant to 40 U.S.C. § 472(g) and the regulations at 41 C.F.R. § 101–43.311, and that it does not protect holders of transferred property that merely purports to be surplus. According to

the defendants, the word "purporting" in section 203(d) modifies "to transfer" and not "surplus property." The defendants cite *Finsky v. Union Carbide & Carbon Corp.*, 249 F.2d 449, 458 (7th Cir.1957), *cert. denied*, 356 U.S. 957, 78 S.Ct. 993, 2 L.Ed.2d 1065 (1958), to support this position: "§ 484(d) of the [FPASA] ... limits its application to *surplus property* under *that* act" (emphasis in original). By this construction, 40 U.S.C. § 484(d) would not protect the plaintiff's interest in the planes, since GSA never declared the planes to be surplus property.

■ This court finds neither *Finsky* nor the defendants' interpretation of section 203(d) persuasive. Immediately following the word "purporting," and the most natural object of that word, is the entire phrase "to transfer title or any other interest in surplus property under this subchapter." 40 U.S.C. § 484(d). This larger phrase—from "purporting" through "subchapter"—follows and modifies the noun-phrase "[a] deed, bill of sale, lease, or other instrument executed by or on behalf of any executive agency." *Id.* In other words, the bills of sale on which the plaintiff relied in this case purported to transfer *title to property that was surplus* (the only type of government property that Congress has authorized GSA and other agencies to transfer).

Section 203(d) also states that instruments such as bills of sale "shall be conclusive evidence *of compliance with the provisions of [subchapter II]* . . . ." *Id.* Subchapter II of the FPASA, codified at 40 U.S.C. §§ 481–493, provides for, *inter alia*, procurement of property, *id.* § 481; property utilization, including exchange of excess property among Federal agencies, *id.* § 483; and disposal of surplus property, *id.* § 484. "Property," "excess property," and "surplus property" are defined in section 3 of subchapter I of the FPASA, codified at 40 U.S.C. § 472. It defines surplus property as "any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator [of General Services]." *Id.* § 472(g).

There is no explicit provision in subchapter II of the FPASA describing how GSA is to

determine that property is surplus. Arguably, then, one could say that GSA does not make this determination in compliance with the provisions of subchapter II. However, surplus property is property that is excess, as determined by an executive agency pursuant to 40 U.S.C. § 483(b)(2), and, in addition, it is property that no other Federal agency requires. *Id.* § 472(g). The GSA determines that no other Federal agency requires excess property when no other Federal agency requests a transfer of the excess property; indeed, current regulations deem property surplus when no Federal agency has requested excess property within a fixed time after an agency's designation of property as excess. 41 C.F.R. § 101-43.311-1 (reportable property, "not transferred to other Federal agencies, shall become surplus property at the close of business on the surplus release date," which is usually within sixty days of a report of excess personal property to GSA); *id.* § 101-43.311-2 (nonreportable property not selected for transfer to other agencies "will become surplus at the close of business on the surplus release date"). Since Federal agencies declare property excess and agencies exchange (or do not exchange) excess property in compliance with the provisions of subchapter II, the court concludes that a GSA determination that property is surplus is made in compliance with the provisions of subchapter II.

Therefore, since GSA determines that property is surplus in "compliance with the provisions of [subchapter II]" of the FPASA, and since a "bill of sale ... executed by or on behalf of" the Forest Service is "conclusive evidence of compliance with the provisions of [subchapter II]," the bills of sale on which the plaintiff relied are conclusive evidence, as concerns the plaintiff's claim to title, that GSA declared the property surplus in compliance with the Act, even if GSA did not. Indeed, the bills of sale are conclusive evidence, as regards the plaintiff's title to the planes, that the defendants complied with *all* provisions and regulations under subchapter II of the FPASA regarding the transfer of government property, including the regula-

tions regarding historic exchanges that the Forest Service had, in fact, violated.

■ The defendants argue that the plaintiff should not have relied on the bills of sale, but should have, for example, gone to GSA to find out if the planes were surplus. The defendants cite *Finsky*, in which the court noted that the "plaintiffs [were] unable to point to any action by the Administrator directing or supervising the sale ..., as required by § 484(a), nor can they show that this surplus property was disposed of by the Administrator or by an executive agency ... as provided in § 484(b)." *Finsky*, 249 F.2d at 458. Once it is conceded that GSA determines that property is surplus in compliance with the provisions of subchapter II, this suggestion that a grantee or transferee must have proof in addition to an instrument that transfers title to be protected by section 203(d) vitiates it. First, bona fide transferees for value "without notice of lack of such compliance" are protected by section 203(d), so by its terms they are under no obligation to find evidence of compliance.[1] Second, the purpose of section 203(d) is that instruments like bills of sale are themselves supposed to serve as conclusive proof of compliance; no other evidence is needed. When no such instrument exists, section 203(d) is not applicable. The court in *Finsky* noted as much itself when it stated that since "there never was any instrument executed purporting to transfer the title, § 484(d) does not sustain plaintiffs' position." *Id.* at 458. When, as here, plaintiff paid value and is able to point to an instrument transferring title, section 203(d) *does* apply to protect title. *See id.* (title to one barrel of tungsten, for which title had passed to plaintiffs because they had received and paid for it, remained with plaintiffs); *see also United States v. Jones*, 176 F.2d 278, 289 (9th Cir.1949) (section 25 of the Surplus Property Act of 1944 protected purchasers who paid value and who could produce proper instruments acknowledging transfer of title to the purchaser).

---

1. In this case, the plaintiff perfected its security interest in the planes before it was on notice, actual or constructive, of the lack of compliance

with the statutes and regulations governing the disposal of government property.

The legislative history of the FPASA supports this court's interpretation of section 203(d). The House Report on the FPASA stated that section 203(d)

is designed to protect the interest of bona fide grantees or transferees. It makes instruments purporting to transfer title or other interest in surplus property under this act, which are executed by an executive agency, conclusive evidence of compliance with the provisions of the act in the absence of notice of defects.

H.R.Rep. No. 670, 81st Cong., 1st Sess. 14 (1949), *reprinted in* 1949 U.S.Code Cong. Service 1475, 1488–89. *See also* S.Rep. No. 475, 81st Cong., 1st Sess. 16 (1949). The defendants ask this court to hold that section 203(d) of the FPASA does not protect a transferee who mistakenly and honestly believes the property to be government surplus. This interpretation of section 203(d) thwarts its specific purpose of protecting bona fide grantees and transferees. In addition, such a holding would presumably reduce the price that the government receives for government surplus, either because purchasers of government surplus would have to bear the cost of investigating its status as surplus, or because the market would discount the price to reflect the risk that the property might not be surplus. Such a holding would frustrate a general purpose of the FPASA: to create an "economical and efficient system for ... the disposal of surplus property." 40 U.S.C. § 471. *See Mailet*, 294 F.Supp. at 766; *see also Jones*, 176 F.2d at 290.

Finally, the defendants argue that section 203(d) of the FPASA, as a replacement for section 25 of the Surplus Property Act of 1944 (SPA), narrowed the scope of protection for bona fide purchasers for value. Section 25 of the SPA stated that:

A deed, bill of sale, lease, or other instrument executed by or on behalf of any Government agency purporting to transfer title or any other interest in property under this Act shall be conclusive evidence of compliance with the provisions of this Act insofar as title or other interest of any bona fide purchasers for value, or lessees, as the case may be, is concerned.

Surplus Property Act, ch. 479, 58 Stat. 765, 780 (1944). Unlike section 25 of the SPA, section 203(d) of the FPASA includes the word "surplus" before property. The defendants assert that the addition of "surplus" before property serves to narrow section 203(d) as compared to the broader section 25 of the SPA.

The court finds, however, that neither section 203(d)'s construction, *see* discussion *supra,* nor the legislative history of the FPASA suggests that Congress intended section 203(d) to limit an overly broad section 25.[2] Although neither the floor debate nor the various reports compare section 203(d) to section 25 directly, general comparative statements suggest that the FPASA's provisions on disposal of surplus property were meant merely to supersede the SPA, which was set to expire, and not to replace it with something wholly different. For example, Representative Holifield, the House sponsor of the bill, stated that the FPASA provisions concerning the disposal of surplus property "generally follow those contained in the present Surplus Property Act of 1944." 95 Cong. Rec. 7,442 (1949). Representative Holifield noted some exceptions to this statement, but he did not mention that section 203(d) would narrow the protection that had been afforded bona fide purchasers for value under the SPA. *Id.* at 7,443.

The plaintiff here, an innocent third party who acquired an interest in the planes for value, clearly falls within the protective ambit contemplated by Congress when it drafted section 203(d) of the FPASA.

## CONCLUSION

For the foregoing reasons, this court holds that section 203(d) of the FPASA protects plaintiff's title to the two C–130 airplanes.

---

**2.** It may be that section 203(d) is more limited than section 25 in another respect, because it includes the phrase "without notice of lack of such compliance" and section 25 does not. *See Jones*, 176 F.2d at 289 (noting that section 25 protected not merely "innocent third parties, into whose hands property may go, but *the very parties with whom agencies dealt and to whom the instruments were made out,* ... if they paid value") (emphasis in original).

Plaintiff's motion for summary judgment is GRANTED and defendants' cross motion for summary judgment is DENIED. It is so ordered.