**AERO UNION CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 99–952C.**

United States Court of Federal Claims.

Sept. 26, 2000.

Harry R. Silver, Washington, DC, for plaintiff.

Kent G. Huntington, Washington, DC, with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after argument on plaintiff's motion for summary judgment. Three questions are presented concerning whether a transferee is protected from a claim by the Government for the return of six aircraft exchanged for other refurbished aircraft. The transferee challenges the Government's right to assert a claim under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1994 & Supp. IV 1998), after initially declaring the contracts void and filing an unjust enrichment claim. The transferee claims protection under section 203(d) of the Federal Property and Administrative Services Act, 40 U.S.C.A. §§ 471–489 (West 1987 & Supp.2000) (the "FPASA"), which protects the holders of bills of sale issued by the Government. Finally,

the transferee contends that it will suffer economic harm by returning the aircraft such that laches should bar the Government's claim. The court rules that genuine issues of material fact are present concerning whether the transferee knew that the transactions did not comply with the law and whether the Government has delayed too long in attempting to exercise any legal or statutory remedies such that plaintiff has been prejudiced by the delay.

## FACTS

Aero Union Corporation ("plaintiff") is a contractor providing aerial firefighting services to the United States Forest Service (the "Forest Service").[1] Between 1988 and 1989, the Forest Service entered into Exchange Agreements with five of its firefighting contractors, including plaintiff, pursuant to the Forest Service's Historic Aircraft Exchange Program (the "Program"). The Forest Service initiated the Program, and the primary goals of the Program included replacement of contractors' obsolete and grounded planes and reduction of future contracting costs in fighting forest fires. Under the Program the Forest Service exchanged planes received from the Departments of the Army and Navy on a one-to-one basis for historic planes held by airtanker contractors. The contractors were responsible for making the subsequent modifications required to use the planes from the Government as firefighting airtankers. *See Pacific Harbor Capital v. Dept. of Agriculture*, 845 F.Supp. 1, 2 (D.D.C.1993).

The Forest Service and plaintiff entered into two Exchange Agreements, dated September 27, 1989 and December 12, 1989, which provided for plaintiff to receive six P–3A aircraft (four and two, respectively) in exchange for plaintiff's tendering to the For-

est Service various restored and flyable aircraft at a plane-for-plane basis. Both agreements recite that they were made under the authority of GSA Regulation 101–46.203, 41 C.F.R. § 101–46.203 (1989); were signed by L.A. Amicarella, Director, Fire and Aviation Management for the Forest Service; and would be "considered consummated upon delivery of all aircraft by both parties."

The aircraft exchanges were completed by 1991. Plaintiff received a bill of sale for each of the six P–3As signed by Fred A. Fuchs, the Forest Service's Assistant Director for Aviation, and plaintiff registered the P–3As with the Federal Aviation Administration (the "FAA"). Plaintiff spent $3 million modifying the P–3As for use as airtankers in its firefighting contracts with the Forest Service.[2] Although one P–3A was destroyed in a crash in 1992, the remaining five aircraft have been used by plaintiff in support of its Forest Service contracts.

In December 1989 the Office of the General Counsel of the Department of Agriculture (the "USDA") issued a non-public letter questioning the legality of the aircraft exchanges. *See Pacific Harbor*, 845 F.Supp. at 2. After investigating the Exchange Program, the USDA Office of the Inspector General ("OIG") published an audit of the aircraft exchange in 1992, taking the position that the Forest Service lacked the requisite authority to enter into the Exchange Agreements. *See id.*, at 2. The Government did not take action to recover the exchanged aircraft from any of the contractors at that time.

In 1994, two years after the OIG determination, a relator filed a *qui tam* action under the False Claims Act, 31 U.S.C. § 3730(b) (1994 & Supp. IV 1998),[3] against the five Forest Service contractors that participated in the Exchange Program[4] and against a

---

1. Plaintiff has been in the aerial firefighting equipment and services business since the 1960's.

2. Defendant disputes this fact, but not in a manner that could prevent a finding. See RCFC 56(f); *see also* pages 687–88 *infra*.

3. A private person ("relator") may bring an action in the name of the United States under the

*qui tam* provision of the False Claims Act. 31 U.S.C. § 3730(b). The Government has the option of either electing to intervene and proceeding with the action or declining to intervene, giving the relator the right to prosecute the action.

4. The five contractors, in no particular order, were T & G Aviation, Inc.; Hawkins & Powers Aviation, Inc.; Hemet Valley Flying Service; TBM, Inc.; and plaintiff.

broker for several of the transactions, Roy D. Reagan. *See United States ex rel. Eitel v. Reagan,* 898 F.Supp. 734 (D.Or.1995), *remanded,* Civ. No. 95–35969 (9th Cir. June 4, 1997). The *qui tam* suit put forth multiple allegations, the most relevant of which was that the defendants, including plaintiff in this suit, knew that they were making illegal purchases of government property and knew that the value represented of certain aircraft exchanged with the Forest Service was inaccurate. *Eitel,* 898 F.Supp. at 735. The Government gave notice on June 1, 1995, that it declined to intervene. *Id.* at 738. The court dismissed the *qui tam* suit for lack of subject matter jurisdiction on August 16, 1995, after it found that a majority of the relator's information came from public sources and not his own personal knowledge.[5] *Id.* at 739.

In June 1995 a grand jury indicted Messrs. Reagan and Fuchs for fraudulently obtaining the aircraft from the Department of Defense. The indictment alleged related wrongdoing by three of the five Forest Service contractors, which resulted in Mr. Reagan's receiving over $1 million, but plaintiff was not mentioned. (Although Messrs. Fuchs and Reagan were convicted, the convictions were reversed on July 6, 2000, because the jury instructions allowed the jury to consider overt acts in furtherance of the conspiracy that were outside the statute of limitations. *United States v. Fuchs,* 218 F.3d 957, 961 (9th Cir.2000).)

In the meantime, on January 14, 1997, the Government filed a motion to intervene in the appeal of the *qui tam* action's order of dismissal for the purpose of a limited remand to allow the Government to intervene in the original action. After the remand was ordered on February 6, 1997, the Government

moved to intervene in the *qui tam* action only with respect to Mr. Reagan and three of the Forest Service contractors.[6] Plaintiff was named in the style of the case, but not in the motion. Defendant's motion to intervene further stated with respect to "those defendants against whom the United States is not intervening, there is no prejudice except that the finality of this Court's order as to them will be delayed until the entire case is resolved." U.S. Mot. To Intervene, filed Jan. 16, 1998, at 5 (*citing Federal Recovery Services, Inc. v. United States,* 72 F.3d 447 (5th Cir.1995)), *United States ex rel. Eitel v. Reagan,* Civ. No. 94–425 JO (D.Or.). Acknowledging its decision to not intervene in 1995, the Government justified its later request to intervene on "developments, including the criminal indictment of one of the defendants and the dismissal of this *qui tam* suit[.]" U.S. Mot. To Intervene filed Jan. 16, 1998, at 1–2, *United States ex rel. Eitel v. Reagan,* Civ. No. 94–425 JO (D. Or.).

By order entered on March 12, 1997, the case was transferred from the District of Oregon to the District of Arizona, where the latter court granted the Government's motion to intervene. The Government filed its Amended Complaint on January 30, 1998. Count Four is the only count of the amended complaint that mentions plaintiff. That count alleges that plaintiff, as well as the other Forest Service contractors, were not entitled to the aircraft received, and thus were unjustly enriched.[7]

While the Government's Amended Complaint was pending in district court, plaintiff received a letter dated November 27, 1998, from Ronald E. Hopper who, the letter explains, had been appointed contracting officer for the USDA.[8] The contracting officer, who

---

5. 31 U.S.C. § 3730(e)(4)(A) requires that the person bringing a *qui tam* action be an original source of the information. The court in *Eitel* found that complainant's information was derived primarily from an article in *Conservation Aeronatics* magazine and his follow-up FOIA requests to the Forest Service. *Eitel,* 898 F.Supp. at 739.

6. The three contractors moved against were Hemet Valley Flying Service; Hawkins & Powers Aviation, Inc.; and TBM, Inc.

7. Counts One through Three contain allegations of fraud and conspiracy against other contractors, as well as Messrs. Fuchs and Reagan.

8. The certified letter recited:

The Government appoints a contracting officer to an unauthorized agreement to examine this agreement and determine the appropriate and legal Government course of action. The Government is not bound by the unauthorized acts of its agents. After extensive deliberation, including consultation with legal counsel, I, in my independent judgment, determine that the FS has no

had been appointed almost a decade after the Exchange Agreements were executed, declared the agreements "void from the beginning," to the end that no title exchange ever occurred. The contracting officer also requested the return of the Government aircraft, and stated that the Government would return plaintiff's "historic aircraft." The announced basis of the contracting officer's decision was that Congress had not provided the Forest Service with the authority to enter into the exchanges, and thus the Exchange Agreements did not comply with the requirements of the FPASA and the Federal Property and Management Regulations, 41 C.F.R. § 101 (1995) (the "FPMR"), for the disposal of Federal aircraft.[9] Due to the pending district court action, the Arizona federal district court stayed the enforcement of the contracting officer's demand. *United States v. Reagan,* Civ. No. CV–97–169–TUC–WDB (D.Ariz. Feb. 1, 1999).

On plaintiff's motion the district court dismissed as time barred the Government's complaint regarding unjust enrichment. *United States v. Reagan,* Civ. No. 97–169–TUC–WDB (D.Ariz. Apr. 19, 1999). While the court ruled that allegations concerning the False Claims Act in the Government's complaint related back to the original *qui tam* action, it held that the statute of limitations with respect to the unjust enrichment claim expired six years after the cause of action accrued.[10] The Government had characterized the Exchange Agreements as "void and not enforceable," but the court stated that, to the extent the Government's unjust enrichment claim rests upon the value of the aircraft that the Government received, the Forest Service should have been aware of its injury as soon as the aircraft were exchanged.

The district court issued its order on April 19, 1999. As the only allegation involving plaintiff was dismissed as time barred, plaintiff was dismissed from the action. The stay on the contracting officer's request for action was lifted by order of the Arizona district

court. *United States v. Reagan,* Civ. No. CV 97–169–TUC–WDB, (D. Ariz. filed Oct. 13, 1999). Plaintiff filed the present suit on November 24, 1999, seeking judgment that the Exchange Agreements are valid binding contracts and that the contracting officer lacks authority to demand return of the six aircraft received under the agreements.

## DISCUSSION

### 1. *Summary judgment*

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and there are no disputes over material facts that may significantly affect the outcome of the suit. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The moving party bears the burden of demonstrating the absence of genuine disputes over material facts. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.; see H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). Although summary judgment is designed " 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1); *see Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988), a trial court may deny summary judgment if "there is reason

---

authority to enter into these agreements, and therefore I declare the agreements void.

**9.** The decision did not discuss the inadequacy of plaintiff's historic aircraft.

**10.** *See* 28 U.S.C. § 2415(a) (1994).

to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

*2. Jurisdiction of the court and authority of the contracting officer*

■ Jurisdiction in the Court of Federal Claims is prescribed by the Tucker Act, 28 U.S.C. § 1491 (1994 & Supp. IV 1998), which provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C.A. § 1491(a)(1). While conferring jurisdiction, the Tucker Act does not create a substantive right enforceable against the United States for monetary damages. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Thus, a plaintiff must found its claim on a separate statute or regulation permitting recovery. *See Testan,* 424 U.S. at 398–401, 96 S.Ct. 948. Plaintiff brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1994 & Supp. IV 1998) (the "CDA"), under which a contracting party may appeal a contracting officer's final decision to the Court of Federal Claims in lieu of, under 41 U.S.C. § 605, appealing the decision to an agency board. 41 U.S.C. § 609.

Plaintiff challenges the contracting officer's authority to render any decision when the party appointing the contracting officer already has claimed that the two Exchange Agreements are void, and thus no "legally binding, enforceable express or implied-in-fact" contracts can be enforced. Under section 602(a), the CDA applies to any "express or implied contract." However, the CDA does not apply to implied-in-law contracts for the purposes of unjust enrichment. *Gould v. United States,* 67 F.3d 925, 928 (Fed.Cir. 1995) (*citing Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925) (stating that implied-in-law contracts are not within the United States Claims Court's jurisdiction)).

Defendant's complaint against plaintiff, filed in January 1998, nine years after the Exchange Agreements were executed, alleged that plaintiff had been unjustly enriched in receiving the aircraft because the agreements were "void and not enforceable." Within months of asking for quasi-contractual relief, defendant also claims that jurisdiction lies under the CDA and had a contracting officer appointed. Eleven months after the Government's complaint was filed in the District of Arizona, plaintiff received a letter from Mr. Hooper, a recently appointed contracting officer, stating that the agreements were "void from the beginning," and demanding return of the aircraft transferred to plaintiff.

Plaintiff primarily questions the contracting officer's authority under the CDA because defendant took the position that the Exchange Agreements were void and cannot support an implied-in-law claim, yet later makes an implied-in-fact claim with respect to the same agreements that it repeatedly declared void. Defendant interprets plaintiff's argument broadly as advocating that CDA jurisdiction is not available for void contracts. According to defendant, if the CDA were inapplicable to void contracts, a contracting officer would be required to address the merits of the contract in order to determine whether the CDA applies. Defendant points to *American Telephone & Telegraph v. United States,* 177 F.3d 1368 (Fed. Cir.1999), holding that a contract found void *ab initio* can still be the basis for a claim under the CDA. However, defendant has misconstrued plaintiff's argument. *AT & T* can be factually distinguished from the present case. The court in *AT & T* held that the contract was void because it violated an appropriations act, whereas in the case at bar defendant has previously declared the same contracts void. Plaintiff posits that once the Government has declared a contract void, that party should not be allowed to appoint a contracting officer.

The court applauds plaintiff's suggestion as an effective means to bind a party to its

initial legal claim and prevent multiple bites at the proverbial apple. However, the jurisdiction for government contract claims created by the CDA effectively prevents the Government from arguing both implied-in-law and implied-in-fact theories, in the alternative, in one forum. Despite the fact that defendant followed a circuitous route before appointing a contracting officer, defendant bolsters its CDA jurisdiction argument by citing *United States v. J & E Salvage, Co.,* 55 F.3d 985, 989 (4th Cir.1995) (holding that claims cloaked in tort language, but requiring examination of contract, should be treated as contract claims under the CDA). Defendant states, "the Fourth Circuit found that the Government's effort to recover property should be decided under the CDA, notwithstanding the Government's claim that the contract was void." Def.'s Br., filed June 30, 2000, at 7. Defendant even goes so far as to paraphrase language from the Fourth Circuit's opinion in its oral argument: that the contract was "the alpha and omega of this dispute." *See J & E Salvage,* 55 F.3d at 989. Ironically, the Fourth Circuit's opinion in *J & E Salvage* should have signaled the Government that the appropriate action was to appoint a contracting officer to this matter, rather than to file an amended complaint for unjust enrichment in the federal district court of Arizona. Indeed, "respect for the jurisdictional route set forth in the CDA avoids the inefficiencies involved in splitting an action between two different forums." *J & E Salvage,* 55 F.3d at 989, 990. A "core contract question belongs in the Court of Federal Claims." *Id.*

Another injustice to plaintiff caused by the split jurisdiction of claims is the Government's ability to "circumvent the six year statute of limitations," which otherwise would bar its unjust enrichment claim. Pl.'s Br., filed Apr. 3, 2000, at 8. After 1994 the Government could not reach back to correct its choice of remedies. In that year the Federal Acquisition Streamlining Act, Pub.L.

No. 103–355 (the "FASA") (amending or changing various parts of U.S.C. titles 10, 15, 18, 31, 33, 37, 40, 41, 42, and 49), amended section 6 of the CDA, 41 U.S.C. § 605, by adding a six-year statute of limitations applicable to either a private litigant or the Government. *See* Pub.L. No. 103–355, § 2351, 108 Stat. 3243, 3322.[11] However, the Office of Federal Procurement Policy issued 48 C.F.R. § 33.206(b) (1996), in September 1995, which prevents the six-year limitations period from being applied to contracts awarded prior to October 1, 1995. *See Motorola v. West,* 125 F.3d 1470, 1473 (Fed.Cir.1997). As a consequence the court lacks the power to afford plaintiff relief due to defendant's inconsistent pleading.

3. *Standard for protection under § 203(d) of the Federal Property and Administrative Services Act*

■ Plaintiff challenges the defendant's assertion that plaintiff is not protected as a *bona fide* "grantee or transferee" under the FPASA. Section 203(d) of the FPASA, entitled "[v]alidity of deed, bill of sale, lease, etc." provides:

A deed, bill of sale, lease, or other instrument executed by or on behalf of any executive agency purporting to transfer title or any other interest in surplus property under this subchapter shall be conclusive evidence of compliance with the provisions of this subchapter insofar as concerns title or other interest of any bona fide grantee or transferee for value and without notice of lack of such compliance.

40 U.S.C. § 484(d). Plaintiff has a bill of sale signed by Mr. Fuchs, then-Assistant Director for Aviation of the Forest Service, for each of the six aircraft received in exchange for its aircraft. Additionally, plaintiff offers a sworn statement by plaintiff's former president, Dale Newton, stating that plaintiff had no reason to believe that the Exchange Agreements were not in compliance with FPASA or any other legal requirement.[12]

---

11. The third sentence of 41 U.S.C. § 605(a) reads: "Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim."

12. Mr. Newton's statement was given to a special agent of the Office of Inspector General on December 10, 1992. Mr. Newton passed away in 1995.

Plaintiff asserts that the bills of sale are "conclusive evidence of compliance" with section 203 under the ruling of *Pacific Harbor.*

The issue in *Pacific Harbor* was the ownership of the aircraft exchanged between the Forest Service and another of its contractors, TBM, pursuant to the Historic Aircraft Exchange Program. Similar to plaintiff's situation, during 1988 and 1989, TBM exchanged six aircraft with the Forest Service, received six bills of sale, and registered the planes with the FAA. TBM then transferred two of the planes to Mr. Reagan as payment for having acted as a broker for the exchanges. *Pacific Harbor,* 845 F.Supp. at 3. Mr. Reagan sold these planes to another contractor, T & G, with assurances that he would pass clear title. Based on Mr. Reagan's assurances, T & G secured financing of $2.4 million from Pacific Harbor Capital (PHC) in order to purchase the two planes from Mr. Reagan, as well as eight other planes that PHC had repossessed from a previous borrower. *Id.* at 3. On January 25, 1993, after defaulting on its loan, T & G turned the two planes over to PHC. When PHC put the planes for sale on the market, it received a letter from the Forest Service advising it that the Government had an interest in the planes.

The court in *Pacific Harbor* found that the Forest Service's transfers of the planes were unauthorized because they were not in compliance with GSA regulations regarding government property. Despite this finding the court ruled that PHC was protected under section 203 of the FPASA. The court pointed to the fact that GSA is responsible for determining whether property is surplus under subchapter II of FPASA, 40 U.S.C. § 472, and that section 203(d) states that a bill of sale executed by or on the behalf of an agency—in this case the Forest Service—is "conclusive evidence of compliance" with subchapter II. Thus, the court reasoned, the bills of sale PHC relied on were conclusive evidence that GSA declared the aircraft surplus, even if GSA did not. *Pacific Harbor,* 845 F.Supp. at 4. The court held further that the bills of sale were conclusive evidence, regarding PHC's title to the planes, of compliance with all the provisions and regulations of subchapter II of the FPASA with respect to the aircraft exchanges. *Id.* at 4.

In *Pacific Harbor* the Government argued, as it does here, that the purchaser should have investigated whether the aircraft were actually surplus, rather than relying on the bills of sale. The district court rejected the Government's suggestion, relying in part on FPASA's legislative history. Section 203(d), according to the House Report,

> is designed to protect the interest of bona fide grantees or transferees. It makes instruments purporting to transfer title or other interest in surplus property under this act, which are executed by an executive agency, conclusive evidence of compliance with the provisions of the act in the absence of notice of defects.

H.R.Rep. No. 670 (1949), *reprinted in* 1949 U.S.Code Cong. Service 1475, 1488–89, *quoted in Pacific Harbor,* 845 F.Supp. at 5. The court reasoned that construing section 203(d) of the FPASA not to protect a transferee who "mistakenly and honestly believes the property to be governmental surplus" would "thwart" the specific purpose of that provision. *Pacific Harbor,* 845 F.Supp. at 5.

Defendant counters that plaintiff fails to meet the requirements of section 203, *i.e.,* is not a *bona fide* transferee, and that section 203 does not apply to the transactions because the aircraft transferred were not surplus. Defendant argues that the bills of sale alone do not give plaintiff protection under section 203, and that *Pacific Harbor* is not controlling precedent for several reasons. First, defendant points to the convictions of Messrs. Reagan and Fuchs subsequent to the *Pacific Harbor* decision as factors which might have affected the district court's determination of legitimacy of the transactions. However, those convictions have since been reversed because the jury was allowed to consider actions in furtherance of a conspiracy that should have been barred by the statute of limitations. Furthermore, the district court's reasoning in *Pacific Harbor* was not grounded on the legitimacy of the aircraft exchanges, but, rather, on the notion that to punish the innocent transferee in that case would remove all force from section 203(d).

Second, defendant distinguishes *Pacific Harbor* from the facts of the case at bar. In *Pacific Harbor*, PHC is an actor several transactions removed from the original exchange, whereas plaintiff in this case was a party to the original exchange. While it is true that PHC was not a party to the initial Exchange Agreement, the court in *Pacific Harbor* did not mention PHC's status as an indirect transferee as a basis for its decision. The court appears to focus solely on the language of section 203(d) and its legislative history. *See also J & E Salvage Co. v. United States*, 37 Fed.Cl. 256 (1997) (holding that 40 U.S.C. § 484(d) did not protect purchaser in dispute over transmissions not listed on bill of sale, but may have provided conclusive evidence of title if dispute had concerned the containers listed on bill of sale.)

Defendant also insists that, unlike PHC, plaintiff was "on notice" from the Exchange Agreements that the applicable regulations under FPMR related to the museum exchange of excess property, not surplus property. Def.'s Br., filed June 30, 2000, at 20. Defendant relies on *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), for the writ that rules appearing in the Federal Register give legal notice of their contents, and thus parties contracting with the Government have the responsibility of knowing the applicable regulations. In particular, according to defendant, plaintiff should have known that both items being exchanged must be historic, 41 C.F.R. § 101–46.001–4 (1989), and that military aircraft still used by active or reserve units are not considered historic.[13]

Defendant offers a letter dated April 29, 1991, from Charles P. Isele, plaintiff's Director of Operations, to Mr. Fuchs discussing plaintiff's providing spare P–3A parts for the Navy. This letter indicates that plaintiff knew that the military was actively still using the P–3As, and probably was aware of the military's use of P–3As before the exchanges

were completed. Plaintiff rejoins with Mr. Newton's sworn statement denying knowledge of Forest Service misconduct to support plaintiff's disclaimer of non-compliance.

Defendant has raised a genuine issue of material fact as to whether plaintiff should have been on notice that the aircraft exchanges were unlawful. The knowledge attributable to plaintiff before entering into the aircraft exchanges is an element in determining whether plaintiff had reason to know the exchanges were not compliant.

Defendant also contends that numerous other flaws infected the exchanges about which plaintiff knew or should have known. Defendant maintains that plaintiff should know that the relevant regulations prohibit agencies from acquiring property for the sole purpose of exchanging, rather than using, the property. 41 C.F.R. § 101–46.202(b)(6) (1989). According to defendant, plaintiff "was well aware that the P3–As it received had just been received by the Forest Service from the Navy and that the Forest Service acquired the P–3As specifically for the aircraft exchanges, and not for its own official use." Def.'s Stat. of Gen. Issues, filed June 30, 2000, ¶ 6. Defendant points out phone log records between Messrs. Isele and Fuchs, in particular the conversation on February 27, 1991, to the effect that title to a particular plane would be forwarded after the Forest Service held the aircraft for one year. This conversation also raises a genuine issue of material fact as to plaintiff's knowledge regarding compliance with relevant regulations.

Defendant maintains that unequal value is demonstrable between the P3–As plaintiff received and the "alleged 'historic'" aircraft plaintiff exchanged, which should have put plaintiff on notice that the transactions were "questionable." Def's Br. filed June 30, 2000 at 19. However, defendant does not substantiate this assertion as required by RCFC 56(f).[14] Defendant offers no evidence of the disparity between the aircraft values. Last-

---

13. 41 C.F.R. § 101–46.203(b) (1989), cross-references sections 101–46.202 (forbidding agencies from acquiring property from another agency solely for exchange purposes; acquired property must be in use for at least one year), 101–46.001–

3 (defining exchange), and 101–46.305 (requiring publication of annual report).

14. The evidence cited by defendant does not provide adequate support for its assertion.

ly, defendant disputes plaintiff's assertion that the aircraft plaintiff delivered to the Government were "fully restored and flyable" on the ground that plaintiff has not offered evidence that the planes were "fully restored and flyable." Def.'s Stat. of Gen. Issues, filed June 30, 2000, ¶ 9. Plaintiff points to the fact that the Government accepted the planes. Additionally, plaintiff asserts that if the planes had not been flyable, the records would reflect delivery costs, which are absent. Pl.'s Reply to Def.'s Stat. of Gen. Issues, filed July 24, 2000, ¶ 3. Defendant has not raised a genuine issue of material fact as to the value of the airplanes that plaintiff delivered.

4. *Laches*

■ To invoke laches a party must show unreasonable and inexcusable delay from the time the claimant knew or reasonably should have known of its claim against the party, and that the delay caused either economic prejudice, or injury to the party's ability to mount a defense. *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc); *accord Cornetta v. United States*, 851 F.2d 1372, 1377–78 (Fed.Cir.1988). No fixed boundaries define the length of time deemed unreasonable, and the duration should be viewed in light of the circumstances. The period of delay is measured from the time the claimant knew or should have known about his claim to the date of the suit. *See Aukerman*, 960 F.2d. at 1032. The application of laches is up to the discretion of the court, and should not be made by application of "mechanical rules." *Aukerman*, 960 F.2d. at 1032 (*citing Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946)).

Defendant argues that laches cannot be asserted against the Government, relying on *JANA, Inc. v. United States*, 936 F.2d 1265 (Fed.Cir.1991). The court in *JANA*, which noted that it was unclear if the defense of laches could be asserted against the Government, ultimately held that laches was not applicable under the circumstances of the case. The court then went on to cite a case that supports plaintiff's position, *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 8 (Fed.Cir.1985). "While acknowledging that the Court of Claims has consistently declined to apply laches in government contract cases, we do not read its decisions as precluding the application of this doctrine in all such cases." *Id.* at 8. Furthermore, the addition of a six-year limitation period to the CDA under FASA, 41 U.S.C. § 605(a), demonstrates the congressional policy against delay in filing government contract claims, which the application of laches would prevent in the case at bar.

■ Plaintiff offers strong evidence showing a lack of diligence on the part of the Government. The aircraft exchanges with plaintiff were completed in 1991, with the majority of the planes exchanged in 1990. The USDA's OIG issued a report declaring the exchanges unauthorized in 1992. In 1993 the Government claimed an ownership interest in other planes exchanged through the same "unauthorized" program by sending a letter stating such. *See Pacific Harbor*, 845 F.Supp. at 2. While in 1994 a *qui tam* action was filed under the False Claims Act against plaintiff and four other contractors that had entered into Exchange Agreements with the Forest Service, the Government expressly declined to intervene in 1995. Furthermore, the *qui tam* action was dismissed due to the holding that the relator obtained the majority of his information through publicly available sources, signifying that the Government had access to and knowledge of the pertinent information. *Eitel*, 898 F.Supp. at 739.

The Government finally took action against plaintiff by intervening and filing an amended complaint on January 30, 1998. The amended complaint sought recovery against plaintiff—not on the original False Claims Act allegations—but based on an unjust enrichment theory. The unjust enrichment claim was dismissed as barred by the six-year statute of limitations. On some unidentified date in 1998 while the Government's unjust enrichment claim was pending, the Government also appointed a contracting officer under the CDA. As stated in plaintiff's brief, "[i]t is difficult to conceive of a greater lack of diligence." Pl.'s Br. filed Apr. 3, 2000, at 15.

Plaintiff argues that it has been economically prejudiced by the Government's inac-

tion based on the resources spent to convert and maintain the planes, as well as the proportional amount of its fleet the aircraft comprise. Plaintiff offers the declaration of Victor E. Alvistur, the current president of plaintiff, to support the assertion that it spent $3 million to transform the aircraft for use in its forest firefighting contracts. Plaintiff further asserts that the five remaining aircraft, after losing one in a 1992 crash, make up 58% of its total fleet and 64% of the fleet plaintiff uses for Forest Service contracts. Plaintiff contends that these two elements together will create tremendous economic hardship if the aircraft are returned to the Government. Additionally, plaintiff stated at oral argument that the death of plaintiff's former president, Mr. Newton, prejudices the presentation of its case, which could have been avoided by swifter action by the Government.

Defendant does not view these facts as amounting to an eight-year delay. Instead, defendant argues that action by the Government, or notice to the plaintiff of possible action by the Government, should be considered and would preclude a laches claim in this case. Defendant is adamant that the relator's filing date in 1994 applies to it because the case was filed on behalf of the Government, regardless of the facts that the Government declined to intervene and that the relator's case was dismissed. In fact, the False Claims Act, while allowing the relator to continue the action on behalf of the United States, entrusts its conduct to the relator. *See* 31 U.S.C. § 3730(c)(3).

Defendant states, "[plaintiff] has been a defendant in an action seeking redress of claims of the United States since at least April 1994 and [plaintiff's] claim of laches is unsupported." Def.'s Br. filed June 30, 2000, at 13. Because plaintiff assisted the Government in its investigation of the exchanges by providing documents, statements, and testimony, defendant charges plaintiff with notice of the controversy surrounding the aircraft exchanges which would preclude a laches defense. Defendant seems to be flipping the laches time standard on its head. The period of delay is measured from the time the claimant knew, or should have known, about his claim to the date claimant files suit, not the time a party is "on notice" of a controversy. "[L]aches focuses on the reasonableness of the plaintiff's delay in suit," whereas equitable estoppel focuses on what plaintiff's conduct has led defendant to reasonably believe. *See Aukerman*, 960 F.2d at 1034.

Although it is undisputed that the Government is allowed to use the 1994 filing date in the False Claims Act action for the allegations of fraud, the Government did not try to argue for unjust enrichment until 1998. When the relator filed suit, plaintiff spent litigation resources preparing itself to defend a claim under the False Claims Act. Plaintiff was not on notice in 1994 that in 1998 it would be required to defend against a claim of unjust enrichment, nor that it would be subject to further review by a contracting officer under the CDA.

Defendant disputes plaintiff's alleged economic injury in two ways. Defendant states it lacks "sufficient information to determine" whether the figure of $3 million spent to transform the aircraft is accurate, as well as whether the aircraft comprise the percentages listed in plaintiff's statements. Def.'s Stat. of Gen. Issues, filed June 30, 2000, ¶¶ 7, 8. Thus, to "address th[ese] allegations, the United States requires discovery." Def.'s Stat. of Gen. Issues, filed June 30, 2000, ¶ 8. To support its discovery requests pursuant to RCFC 56(g), defendant submitted a Declaration of Counsel asking for general discovery regarding the aforementioned issues, principally on the basis that plaintiff filed its motion before defendant answered and that defendant has taken no discovery.

This discovery request is inadequate. A party requesting discovery must state, by affidavit, "explicit reasons why discovery is required in opposition to the motion for summary judgment," *C.W. Over & Sons v. United States*, 44 Fed.Cl. 18, 23 (1999); *see also Opryland USA Inc. v. Great American Music Show, Inc.*, 970 F.2d 847, 852 (Fed.Cir. 1992) (discussing Fed.R.Civ.P. 56(f)). Mere assertions or conclusory allegations are insufficient. *See Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1042–43 (Fed.Cir. 1994) (conclusory and speculative affidavits do not raise an issue of fact). Argument by

counsel, unsupported by affidavit, is similarly unavailing. *See Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir.1984). The party seeking discovery, as the Government has done here, cannot " 'simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts.' " *C.W. Over & Sons,* 44 Fed.Cl. at 23 (*quoting Simmons Oil Corp. v. Tesoro Petroleum Corp.,* 86 F.3d 1138, 1144 (Fed.Cir.1996)). However, "summary judgement is inappropriate unless a tribunal permits the parties adequate time for discovery." *Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corporation,* 840 F.2d 917, 919 (Fed.Cir. 1988) (*citing Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Defendant also argues that despite the dispute over the amount plaintiff spent to make the planes fit for firefighting, whatever amount spent was an initial investment which has since been recouped. The thrust of defendant's argument is that plaintiff would have been required to incur those costs shortly after the exchange, so that even if the Government had taken action immediately, the amount of costs incurred would not have been reduced, and thus plaintiff has not demonstrated an economic hardship that should be barred by laches. This may be argument of counsel, but it is sufficient to point out that plaintiff has not established its entitlement to summary judgment on laches. Whether plaintiff has offered sufficient proof of economic hardship cannot be decided on summary judgment.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Plaintiff's motion for summary judgment is denied without prejudice.

2. Defendant shall file its answer by October 6, 2000, and the Joint Preliminary Status Report shall be filed by October 16, 2000.